**UNITED STATES of America, Plaintiff,**

v.

**Janice M. PENNY–FEENEY, Sean Feeney, Defendants.**

**Crim. Nos. 91–00008 ACK–01, 91–00008 ACK–O2.**

United States District Court,
D. Hawaii.

Aug. 14, 1991.

Daniel A. Bent, U.S. Atty. by Marshall H. Silverberg, Asst. U.S. Atty., Honolulu, Hawaii, for plaintiff.

Alexander Silvert, Federal Public Defender's Office, Honolulu, Hawaii, for defendant Janice M. Penny–Feeney.

Thomas P. Dunn, Honolulu, Hawaii, for defendant Sean Feeney.

## DECISION AND ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS PHYSICAL EVIDENCE

PENCE, Senior District Judge.

### I. INTRODUCTION

Defendants Janice Penny–Feeney and Sean Feeney were indicted on January 9, 1991 on three Counts involving Federal drug and firearm violations. The indictment stemmed from an investigation which lasted approximately two years and culminated in a raid on defendants' home on April 3, 1990. Defendants now move to suppress all physical evidence which was seized pursuant to a state search warrant authorizing the April 3, 1990 search. In addition, defendants request the suppression of physical evidence found in a mail package, addressed to defendant Penny–Feeney, which was seized and opened on September 8, 1989 pursuant to a federal search warrant.

### II. BACKGROUND

#### A. Elements of Probable Cause

On April 3, 1990, Officer Hyland Char of the Kona Vice Section of the Hawaii County Police Department swore to an affidavit he prepared in which he set forth his belief that there existed probable cause to search the residence occupied by Janice Penny–Feeney and Sean Feeney. The following represents the elements of probable cause enumerated in Officer Char's affidavit.

##### 1. *The 1988 Anonymous Female Informant*

According to an anonymous female informant, who made a series of four telephone calls to the "Crime Stoppers" police telephone reporting service in the fall of 1988, Jan Penny [1] had sold drugs in California before moving to Hawaii. The informant

---

1. "Penny" was defendant Penny–Feeney's surname before she married her codefendant, Sean Feeney. Whenever appropriate, the name "Penny" will be used instead of "Penny–Feeney."

also indicated that Jan Penny was still selling marijuana while living in Hawaii and that she was doing so with a man named Anthony Vicar.

On September 8, 1989, based on this information, law enforcement officers obtained a search warrant to search a package sent from California to Jan Penny.[2] The package was in the shape of a container which appeared to have currency inside of it. The execution of the search warrant revealed $2700 in cash inside of the container. The cash was then exposed to a narcotics-trained dog named "Ganz" who gave a positive alert on the money. Jan Penny subsequently picked up the package containing the cash and took it to her house while being observed by law enforcement officers. No charges were ever filed.

### 2. The March 9, 1990 Anonymous Male Informant

On March 9, 1990, an anonymous male informant, who claimed to be a relative of Jan Penny, stated that Jan Penny had been growing marijuana for about three years at her residence in Waikoloa. He explained that the Waikoloa residence contained a large indoor marijuana-growing operation that was run on a continuous basis since its plants were being harvested and trimmed every six weeks.

**2.** Defendant seeks to suppress this earlier warrant authorizing search of the package on independent grounds. However, the earlier warrant was mentioned in the affidavit Officer Char submitted in support of the later warrant application seeking authorization for search of the Penny/Feeney residence. To avoid confusion, the warrant issued to search the package will be referred to hereinafter as the "1989 warrant." The warrant issued authorizing search of the residence will be referred to as the "1990 warrant."

**3.** In particular, the informant stated the following:
that in one portion of Penny's garage marijuana seeds were planted and seedlings were then grown in that area; that older and more mature plants were then separated from the seedlings and grown in another area of the garage; that the plants were raised off the ground upon corrugated-type roofing and that a drip irrigation system was set up for their nurturing; that the excess water was then drained out of the back of the garage area and into a garden; that the grass in the back of the garage was greener

He further stated that in one room there were seedlings and that in another room there were more mature plants. Finally, he described a drip irrigation system used to water the plants as well as large grow lights, air conditioning, and ventilation fans all used to cultivate the plants.

### 3. The March 12, 1990 Known Male Informant

On March 12, 1990 Officer Hyland Char of the Kona Police Department, Vice Section, met with a known male informant who previously had been involved in growing marijuana plants and who had also consumed marijuana. That person told Officer Char that he had personally visited Jan Penny's residence on Pa'akea Street in Waikoloa in December 1989 and had seen there a continuous marijuana growing operation. He described the house as reddish brown in color. The informant told Officer Char that Penny had recently married Sean Feeney and he described Feeney as being approximately thirty years old, 5'11" to 6'0 in height, 190 pounds, with brown hair. Jan Penny was described by the informant as being in her mid-thirties, 5'8", in height, 125 pounds, with blonde hair and blue eyes. He added that Penny operated a blue 1990 Mercury Cougar. The informant then described Penny's marijuana growing operation in great detail.[3]

than any other area of the property; that the garage area was ventilated with the use of an air conditioner and fans that blew out the air and odors through the back end of the garage; that also within the garage area there were between twelve and fifteen grow lights that were of the thousand watt variety; that the thousand watt grow lights remained on continuously; and that because of the large amount of electricity consumed Penny had a person "shave" the electric meter to disguise the actual amount of electricity used; that Penny is able to harvest between eight and ten pounds of processed marijuana every six weeks; that the marijuana is then packaged and sold by the pound; that Penny sells the marijuana for between $2500 to $3000 per pound of dried processed marijuana; that Penny does not sell the marijuana on the street to unknown persons; that the marijuana is now being picked up by a party from the Puna area; that Penny used to ship the marijuana by mail or other means to California; that Penny has since stopped shipping the marijuana via the postal systems since she had received information that the police and postal people were

The informant further told Officer Char that to his knowledge Jan Penny was unemployed and that her present husband, Sean Feeney, was a self-employed carpenter. The informant was under the impression that Sean Feeney's business was not doing very well and that his wife supported him using her drug profits. More specifically, the informant related that Penny was paying between $1100 and $1200 a month for the house in which she and Feeney were living and growing marijuana and that she had recently purchased a brand-new 1990 Mercury Cougar for herself and a brand-new 1990 Ford pick-up truck for her husband. The latter vehicle was alleged to have been purchased with marijuana profits.

Finally, the informant described two of Penny's "close associates," one Debbie Loo and her alleged boyfriend, Tony Vicar. He explained that Loo and Vicar helped Penny with her marijuana operation by harvesting and processing the plants at the Penny residence prior to their packaging and sale.

### 4. Corroboration Of The Information By Officer Char

On March 12, 1990, after speaking to the "known" male informant, Officer Char attempted to corroborate the details of the information received from all three informants. He drove to Waikoloa, twice drove by the Penny house and was able visually to confirm the fact that the defendants were living in the house described by the informants and that their physical appearances were accurately described.

He saw that the grassy area in the rear of the garage was in fact greener than the surrounding area, and that a car registered to Debbie Loo and Anthony Vicar, who were described as coconspirators by the informants, was seen at the Penny/Feeney residence on two separate occasions. Officer Char additionally observed a structure attached to the garage which appeared to be covering the area described by the informants as housing an air conditioner unit. He subsequently confirmed that a 1990 Ford pickup he had seen was in fact registered to Sean Feeney.

### 5. Use Of A Forward Looking Infrared Device

Officer Char thereafter corroborated the information he already had by flying over the Penny/Feeney residence in a helicopter operated by one Don Shearer. Mr. Shearer is a pilot who works for a company that owns a forward looking infrared device ("FLIR"), an instrument which detects heat sources. Mr. Shearer had operated such a device 15 to 20 times in the past for marijuana searches.

Officer Char explained in the affidavit how the FLIR works. It is a passive, nonintrusive instrument which detects differences in temperature on the surface of objects being observed. It does not send any beams or rays into the area on which it is fixed or in any way penetrate structures within that area.

It is important to stress that the instrument's sole function is to detect differences in surface temperatures of objects. Its being directed at objects in the early morning or evening, without sunlight present, shows man-made heat sources on those objects as shading from a white color for intense heat to shades of gray for cooler temperatures on the same objects.[4]

At the pre-dawn hour of 5:15 a.m. on April 3, 1990, Char and Shearer, along with Officer Theodore Gaspar, flew over the Penny/Feeney residence in a helicopter at an altitude of between 1200 and 1500 feet.[5] From the naked eye, the Penny/Feeney residence appeared dark. But with the use of the FLIR, the walls and areas of the garage showed up as bright white indicat-

---

watching her and had received information that she was receiving payment for marijuana via the postal system; and that this information was received by Penny in September of 1989.

**4.** Devices similar to the one used by Officer Char have been used for a variety of purposes including the location of missing persons in a forest, the identification of inefficient building insulation, the detection of hot, overloaded power lines, and the detection of forest fire lines through smoke.

**5.** It should be noted that this was from sea level. This court takes judicial notice that Waikoloa is at an altitude of approximately 900 feet.

ing that heat was escaping from the structure. Adjacent but similar structures were surveyed for comparison and they did not appear in the same color as the Penny/Feeney residence. The results of the thermal device's being aimed at the Penny/Feeney residence were simultaneously recorded on a VHS video tape. Officer Char indicated in the affidavit that he had the video tape in his possession.

Don Shearer told Officer Char that based upon his experience with the FLIR, it would be consistent that a structure being used for the purpose of cultivating marijuana under artificial lighting would produce and show a significant amount of heat due to the large amounts of heat grow-lights or artificial lights generate. Shearer also explained that this heat would also cause the structure to register as warmer on the FLIR than similar types of structures without any internal sources of heat. Officer Char noted in his affidavit that during his prior personal surveillance of the Penny/Feeney residence he saw no evidence of an internal heat source for the residence; i.e., the house had nothing like a chimney on it.

Officer Char added in his affidavit that because the Penny/Feeney residence was emitting heat, the heat had to be generated artificially from within the residence, which would be consistent with the presence of high intensity grow-lights and the indoor cultivation of marijuana. Such an operation is favored by indoor marijuana growers because it is not dependent on weather conditions and cannot be detected by the naked eye.

B. Issuance and Execution of the Warrant

Based on all of the above information viewed in light of his more than ten years of law enforcement experience, Officer Char concluded that there was an indoor marijuana growing operation being conducted within the Penny/Feeney residence. Consequently, on April 3, 1990, Officer Char presented his sworn affidavit for a search warrant before Judge Joseph P. Florendo, Jr. of the District Court of the Third Circuit, State of Hawaii.

On that same day, Judge Florendo issued the search warrant for the Penny/Feeney residence and the warrant was executed. At the residence police officers found approximately 247 marijuana plants, ranging from seedlings to mature plants six feet tall, ten one-thousand watt light bulbs, electric transformers, air conditioning units, an electric meter that had been altered to show a lower amount of electricity than was actually being consumed, drying lines for marijuana, a sophisticated drip irrigation system for the plants, and books and papers showing drug transactions. Also found in the Penny/Feeney bedroom were two rifles in a corner and a loaded handgun in the closet.

On January 9, 1991, the grand jury returned a three count indictment charging Janice Penny–Feeney and Sean Feeney with: (1) planting, cultivating, and growing more than 100 marijuana plants in violation of 21 U.S.C. § 841(a)(1); (2) possessing with intent to distribute more than 100 marijuana plants in violation of 21 U.S.C. § 841(a)(1); and (3) carrying the three firearms while committing the two drug offenses in violation of 18 U.S.C. § 924(c)(1).

On February 8, 1991, defendant Janice Penny–Feeney filed the instant motion to suppress physical evidence. That motion was later joined by her husband and codefendant Sean Feeney.[6]

III. DISCUSSION

As mentioned previously, defendant seeks suppression of evidence seized pursu-

---

**6.** As part of the motion to suppress physical evidence, defendants contended that some of the statements made by the affiant were false or in reckless disregard of the truth and they asked for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). This Court granted defendants' request for a *Franks* hearing exclusively with respect to statements in the affidavit concerning affiant's use of the FLIR. At the conclusion of the hearing, which occurred on July 2–3, 1991 and involved extensive testimony from expert witnesses, this court ruled that Char's statements in the affidavit regarding use of the FLIR were neither knowingly false nor made in reckless disregard of their truth or falsity.

ant to the execution of two separate search warrants: one in 1989 and one in 1990. Since the bulk of defendants' motion is directed at alleged constitutional violations stemming from the latter warrant, its validity will be analyzed first.

### A. Evidence Seized Pursuant to the 1990 Warrant

Defendants argue that the warrant authorizing the search of their residence on April 3, 1990 is constitutionally infirm since it is based on illegally obtained information. In particular, defendants claim that by subjecting their residence to FLIR inspection in the pre-dawn hours of April 3, 1990, the government engaged in a warrantless predicate search of the residence in violation of their Fourth Amendment rights. Insofar as Judge Florendo relied on the results of that predicate search in making a probable cause determination, defendants contend that the 1990 warrant was not supported by probable cause.

### 1. *Existence of a Search under the Fourth Amendment*

■ Before the legality of any alleged FLIR "search" may be considered, it must be determined whether use of the FLIR even constituted a search within the meaning of the Fourth Amendment. The Fourth Amendment provides in pertinent part:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause ...

The United States Supreme Court formulated the test for determining the existence of a Fourth Amendment interest in the landmark case of *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Prior to *Katz,* the relevant issue to be considered for determining whether the government had committed a Fourth Amendment violation was whether the government had been guilty of some "actual physical invasion." *See Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928). Thus, prior to that decision, for example, neither wiretapping nor electronic eavesdropping violated a defendant's Fourth Amendment rights unless the government had engaged in some sort of actual physical invasion.

The *Katz* court repudiated this "trespass" doctrine, however, and held that the capacity to invoke the protection of the Fourth Amendment depends not on a property interest in the place intruded upon but on whether the person seeking the protection of the Amendment had a legitimate expectation of privacy in the invaded place. 389 U.S. at 353 (Harlan, J., concurring). In determining whether a legitimate expectation of privacy exists, two different considerations come into play: first, the individual involved must have exhibited an *actual* expectation of privacy; second, the expectation must be one that society is prepared to acknowledge as reasonable. 389 U.S. at 360–61, 88 S.Ct. at 516–17 (Harlan, J., concurring).

To begin, *Katz* mandates consideration of the FLIR's target in order to determine the object of defendants' asserted privacy interest. This analysis is simplified by an examination of the FLIR instrument itself. As stated previously, the FLIR's function is limited to detecting differences in temperature on the surface of an object being observed. Thus, the FLIR detects emanations of heat or relative absences thereof. Accordingly, on the morning of April 3, 1990, the FLIR used by Officer Char to observe the exterior of the Penny/Feeney abode did no more than gauge and reflect the amount of heat that emanated therefrom.

The *Katz* analysis also implicitly requires an examination of the nature of the heat itself. In this instance, the heat was an incidental byproduct of various energy sources used to help cultivate marijuana. Defendants in no way attempted to impede its escape or assert dominion over it. Indeed, the record indicates that defendants used exhaust fans and various other means to vent the heat outside of the premises. Given these facts, it is accurate to describe the generated heat as "heat waste," or "abandoned heat."

The question under *Katz* thus becomes whether movants had a legitimate expectation of privacy in this "heat waste." As stated above, to determine whether defendants had a legitimate expectation of privacy in the heat waste, *Katz* requires a consideration of whether defendants exhibited an actual expectation of privacy and whether the expectation is one that society is prepared to acknowledge as reasonable.

Here, the record reveals that defendants did not manifest an actual expectation of privacy in the heat waste since they voluntarily vented it outside the garage where it could be exposed to the public and in no way attempted to impede its escape or exercise dominion over it.

Moreover, even if defendants were capable of demonstrating a subjective expectation of privacy in the heat waste, the Supreme Court's holding in the case of *California v. Greenwood*, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1987), suggests that such an expectation would not be one that society would be willing to accept as objectively reasonable. In *Greenwood*, the Supreme Court considered "whether the Fourth Amendment prohibits the warrantless search and seizure of garbage left for collection outside the curtilage of a home." 486 U.S. at 37, 108 S.Ct. at 1627.

In concluding that it did not, the Court reasoned that society is not prepared to accept as objectively reasonable an expectation of privacy in plastic garbage bags left outside the home.

> Here we conclude that respondents exposed their garbage to the public sufficiently to defeat their claim to Fourth Amendment protection. It is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public.

486 U.S. at 40, 108 S.Ct. at 1628–29.

In the instant case, the heat waste vented outside of the Penny/Feeney home may be analogized to the garbage placed outside of the respondent's home in *Greenwood*. Both cases involve a homeowner's disposing of waste matter in areas exposed to the public. In *Greenwood*, the exposure was visual and the Court found that it was in no way diminished by the fact that the garbage was stored in opaque trash bags. Here, the exposure is heat-sensory and is in no way diminished by the fact that the source of the heat could only be detected by use of the FLIR.

Time and again, the United States Supreme Court has held that police utilization of extra-sensory, non-intrusive equipment, such as the FLIR, to investigate people and objects does not constitute a search for purposes of the Fourth Amendment. *See, e.g., United States v. Knotts*, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) (placing beeper in container to track movements of vehicle to a remote cabin in the hills not considered a search); *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (using a drug detection dog to sniff luggage at an airport is not a search); and *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (establishing a "pen register" with the phone company to ascertain what phone numbers were called by a private residence not held to be a search).

Of these other nonintrusive police activities, perhaps the one most analogous to use of the FLIR is use of a dog sniff. In *United States v. Solis*, 536 F.2d 880 (9th Cir.1976), a government drug agent went to a trailer parked in a public area on an informant's tip that there was marijuana in the trailer. The agent found the trailer's rear doors partly covered with talcum powder, which was commonly used to conceal the odor of marijuana. Consequently, specially trained marijuana sniffing dogs, whose sense of smell was eight times as acute as that of a human, were taken to the trailer where they indicated that marijuana was located inside the trailer. On the basis of the manner in which the dogs reacted toward the trailer, a magistrate issued a search warrant for the trailer, where large amounts of marijuana were found.

The district court granted defendant's motion to suppress on the grounds that the warrantless detection of the marijuana by the dogs constituted an unlawful search

and that the subsequent search authorized by the warrant was fruit of the earlier illegal search. The Ninth Circuit reversed. It held that use of the dog sniff did not constitute an illegal invasion of privacy. In particular, it stated:

> There was an expectation that the odor would emanate from the trailer. Efforts made to mask it were visible. The method used by the officers was inoffensive. There was no embarrassment to or search of the person. The target was a physical fact indicative of possible crime, not protected communications. We hold that the use of the dogs was not unreasonable under the circumstances and therefore was not a prohibited search under the fourth amendment.

536 F.2d at 882.

Like the odor in *Solis*, there was an expectation that the heat in this case would emanate from the garage since it was *deliberately* vented by use of exhaust fans and other electrical means. Moreover, the method used by officers here was as inoffensive as it was in *Solis*. Use of the FLIR, like use of the dog sniff, entailed no embarrassment to or search of the person. Heat emanations, the target here, are comparable to the odor emanations in *Solis* since they constitute a physical fact indicative of possible crime, *not* protected communications.

Finally, according to well established Fourth Amendment jurisprudence, the fact that the heat emanations were detected in a helicopter flying in the air space above defendants' residence does not in any way strengthen defendants' argument that they had an objectively reasonable expectation of privacy in the heat emanations. In *California v. Ciraolo*, 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), police received a tip that marijuana was growing in respondent's backyard, which was shielded from view at ground level by two fences. Officers secured a private airplane, flew over respondent's house at an altitude of 1,000 feet, and identified marijuana plants growing in the yard. A search warrant was later obtained on the basis of one of the officer's aerial observations.

The Supreme Court held that such police inspection did not amount to a search subject to the Fourth Amendment. In so holding, the Court pointed out that because "the area is within the curtilage does not itself bar all police observation." 476 U.S. at 213, 106 S.Ct. at 1812. Further, the Court stressed the fact that the aircraft was within public navigable airspace and the fact that the observation was physically nonintrusive. *See id.*

In *Florida v. Riley*, 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989), the defendant had a greenhouse 10 to 20 feet behind his home. A wire fence surrounded the home and greenhouse, and the property was posted with a "Do Not Enter" sign. The police were unable to see the greenhouse from the ground level. An officer used a helicopter to circle over the property at 400 feet and saw marijuana growing in the partially open greenhouse.

The Supreme Court held that its decision in *Ciraolo* was controlling and stated that "the home and its curtilage are not necessarily protected from inspection that involved no physical invasion." 109 S.Ct. at 696. The Court then added:

> As a general proposition, the police may see what may be seen "from a public vantage point where [they have] a right to be." 476 U.S., at 213, 106 S.Ct., at 1812. Thus the police, like the public, would have been free to inspect the backyard garden from the street if their view had been unobstructed. They were likewise, free to inspect the yard from the vantage point of an aircraft flying in the navigable airspace as this plane was.

*Id.*

The Court also noted that the nonintrusive use of the helicopter did not interfere with the normal use of the property.

> As far as the record reveals, no intimate details connected with the use of the home or curtilage were observed, and there was no undue noise, no wind, dust, or threat of injury. In these circumstances, there was no violation of the Fourth Amendment.

*Id.* at 697.

Similarly, this case involves a helicopter flying in the public navigable airspace

above defendants' residence. Of utmost importance, however, is the fact that here, as in both *Ciraolo* and *Riley,* the observation was physically nonintrusive. Use of the FLIR in this case caused absolutely no physical invasion of the home or curtilage.

Indeed, Officer Char did no more than aim a passive infrared instrument at defendants' house from an aerial vantage point for the purpose of detecting disposed heat on the *exterior* of the house. No intimate details connected with the use of the home or curtilage were observed, and there was no undue noise, no wind, dust, or threat of injury.

Under both *Ciraolo* and *Riley,* such activity clearly passes constitutional muster and defendants have thus failed to satisfy the objective prong of the *Katz* expectation of privacy test. Overall, then, this court concludes that Officer Char's use of the FLIR in the airspace above defendant's residence for the purpose of detecting surface waste heat did not amount to a "search" within the meaning of the Fourth Amendment.

### 2. *Independent Existence of Probable Cause*

■ The final issue this court must resolve is whether, assuming the FLIR detection ran afoul of the Fourth Amendment, the affidavit in support of the warrant established probable cause even without the FLIR readings. In this case, independent probable cause would be established by the tips furnished to Officer Char by various informants.

In *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), the Supreme Court held that a magistrate should evaluate whether an informant's tip establishes probable cause for issuance of a warrant "under the totality of the circumstances." In particular, the Court held that:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... concluding" that probable cause existed. *Jones v. United States,* 362 U.S. [257], at 271 [80 S.Ct. 725, at 736, 4 L.Ed.2d 697 (1960) ].

462 U.S. at 238, 103 S.Ct. at 2332.

Moreover, in evaluating whether there is a substantial basis for concluding that an affidavit in support of a warrant established probable cause, the Ninth Circuit has emphasized that "interlocking tips from different confidential informants enhance the credibility of each." *United States v. Landis,* 726 F.2d 540, 543 (9th Cir.1984) (citations omitted).

For example, in *United States v. Hernandez–Escarsega,* 886 F.2d 1560 (9th Cir. 1989), a government agent submitted a 52-page affidavit describing in detail his investigation of the defendant, who was convicted on various drug charges. The reliability of several of the agent's confidential sources was not clearly established but this did not prevent a finding that the issuing magistrate had a substantial basis to determine that probable cause existed in light of the interlocking nature of the informants' stories. The Ninth Circuit stated:

> Given the wealth of incriminating information detailed in the Johnson affidavit, we have little difficulty concluding that the magistrate had a "substantial basis" for his probable cause finding. Numerous individuals testified to the fact that Hernandez' involvement with drugs had been far from casual for over ten years. Although the reliability of several of Johnson's confidential sources was not clearly established, the detailed nature of many of their statements and the interlocking nature of their stories enhanced their credibility.

886 F.2d at 1566.

In this case, there are three separate sources of information whose statements are interlocking. First, in the fall of 1988 an anonymous female informant made four separate phone calls in which she identified Jan Penny as a seller of marijuana, and in

which she stated that Penny first sold narcotics while living in California and was continuing to do so after arriving in Hawaii. In 1989, based upon this information, law enforcement officers obtained a search warrant for a package addressed to Jan Penny that was sent from California. In the package was $2700 in cash, which was drug tainted according to a dog sniff.

The second informant, an anonymous male who claimed to be a relative of Jan Penny, reported on March 9, 1990 that Penny had been growing marijuana for about three years and that inside her residence in Waikoloa there was a big indoor marijuana growing operation. He added that the operation was continuous in nature with a marijuana harvest every six weeks. The informant further described in detail the growing operation: in one room there were seedlings while in another room there were more mature plants; there was drip irrigation for the watering of the plants; and there were large grow lights along with air conditioning and fans for ventilation.

The third informant, a known male who explicitly stated that he was an invited guest in the Penny home in December 1989, completely corroborated the information from the other two informants. On March 12, 1990 the known informant told Officer Char that Jan Penny was selling marijuana while living in Hawaii. That information was consistent with that provided by the female informant in 1988 and the anonymous male informant on March 9, 1990.

The known male informant also confirmed the female informant's statement that Anthony Vicar was assisting Jan Penny in her marijuana operation. The known male informant then corroborated the exact description of the inside growing operation that had been described by the anonymous male informant three days earlier: there was a continuous growing operation with a new crop harvested every six weeks; the seedlings were kept in one room while the mature plants were kept in another; the plants were watered using drip irrigation; and there were large grow lights with an air conditioning system and fans for ventilation. All of these specific details were provided separately by the anonymous informant on March 9, 1990 and the known informant on March 12, 1990.

In addition, the known informant told Officer Char that Jan Penny was selling marijuana by the pound for between $2500 and $3000 and that she used to ship the marijuana by mail or other means to California until she became aware in September 1989 that the police and postal inspectors were watching her mail for this reason. That information was independently corroborated by the fact that in September 1989 the police and postal inspectors actually searched, pursuant to a warrant, a package from California that contained $2700 in drug tainted currency.

Officer Char also corroborated the following: (1) the existence of a wooden structure attached to the garage that seemed to have no other purpose than to hide the existence of an air conditioner or fans; (2) the fact that the grass appeared greener in the back of the house; (3) the fact that a car registered to Debbie Loo and Anthony Vicar was seen at the Penny/Feeney residence on two occasions; and (4) the fact that a 1990 Ford pickup was indeed registered to Sean Feeney.

When all of the detailed interlocking information contained in the tips from the three informants is considered, coupled with the fact that some of the incriminating details set forth therein were corroborated by the police, it becomes apparent that the issuing magistrate had a substantial basis for concluding that the affidavit in support of the warrant established probable cause independent of the FLIR readings.

### B. Evidence Seized Pursuant to the 1989 Warrant

As stated previously, on September 8, 1989, postal inspectors obtained a search warrant to open a package addressed to Jan Penny. Inside was discovered $2,700.00 in cash which a narcotics dog named "Ganz" sniffed and "alerted on" indicating the presence of narcotics on the cash. Defendants argue that the affidavit

was facially insufficient to support a finding of probable cause.

However, defendants' argument is without merit. The affidavit in support of the 1989 warrant relied on four separate telephone calls made by the anonymous female informant in the fall of 1988. In those calls the informant identified Jan Penny as a marijuana dealer, who had begun selling narcotics in California and who had continued selling narcotics after her arrival in Hawaii. The informant also stated that Penny was selling narcotics in association with a man named Anthony Vicar.

Under the "totality of the circumstances" test formulated in *Illinois v. Gates*, 462 U.S. at 213, 103 S.Ct. at 2317, this court finds that the issuing judge had a substantial basis for concluding that probable cause existed to issue a warrant for the limited search of a parcel addressed to Jan Penny. However, even if it were found that the 1989 warrant were not supported by probable cause, any evidence seized in the search conducted pursuant to execution of that warrant would nonetheless evade exclusion under the "good faith exception" to the exclusionary rule announced in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

In *Leon*, the Supreme Court held that the "Fourth Amendment exclusionary rule should be modified so as not to bar the use in the prosecution's case-in-chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." *Id.* at 913, 104 S.Ct. at 3415. Here, it is undisputed that the officers who executed the 1989 search warrant acted in reasonable reliance on a facially valid warrant issued by a detached and neutral magistrate. Thus, assuming *arguendo* that the 1989 warrant were not supported by probable cause, the evidence obtained pursuant to its execution still may not be suppressed under the holding in *Leon*.

## IV. CONCLUSION

Based on a reading of all relevant Fourth Amendment precedent, it is apparent that the nonintrusive use of the FLIR in this case did not amount to a "search" within the meaning of the Fourth Amendment. Accordingly, even if the judge who issued the 1990 warrant relied exclusively on the FLIR readings to make a probable cause determination, this court finds that he did not rely on illegally obtained evidence in making that determination. Moreover, even if the FLIR readings had been obtained illegally, the record reveals that there was a substantial basis for the judge to conclude that there was probable cause for issuance of the warrant in the absence of the FLIR readings.

With respect to the 1989 warrant, this court also finds that there was a substantial basis for the magistrate to conclude that there was probable cause for the issuance of the warrant. Additionally, even assuming an absence of probable cause, the evidence seized pursuant to the warrant's execution is not subject to the exclusionary rule under the good faith exception announced in *Leon*, 468 U.S. at 897, 104 S.Ct. at 3405.

Therefore, defendants' Motion to Suppress is denied in its entirety.

IT IS SO ORDERED.