**UNITED STATES of America, Plaintiff,**

v.

**Danny KYLLO, Defendant.**

**CR No. 92–51–FR.**

United States District Court,
D. Oregon.

Dec. 4, 1992.

Order on Reconsideration Feb. 5, 1993.

---

Charles H. Turner, U.S. Atty., Robert G. Thomson, Asst. U.S. Atty., Portland, OR, for plaintiff.

Kenneth Lerner, Portland, OR, for defendant.

## OPINION

FRYE, District Judge:

The matter before the court is the motion of the defendant, Danny Kyllo, to suppress evidence (#30) on the following three grounds: (1) law enforcement officers lacked probable cause to search his home and misled the magistrate judge with deliberate false statements and omissions of fact in order to obtain a search warrant; (2) the use of a thermal imaging device constituted an impermissible search; and (3) the use of a National Guardsman to operate the thermal imaging device was unlawful.

## BACKGROUND

In 1990, a task force of law enforcement officers began investigating Sam Shook for the crime of conspiring to grow and to

distribute marijuana. The investigation of Sam Shook was conducted jointly by several agencies, including the United States Department of Interior, the Bureau of Land Management, the Tillamook County Sheriff's Department, and the Oregon State Police Bureau. In July, 1991, four search warrants supported by the sworn affidavit of Special Agent William Elliott of the Bureau of Land Management were issued by United States Magistrate Judge George E. Juba and subsequently executed by the task force.

After these search warrants had been executed and the fruits of the executions of the search warrant had been analyzed, the investigation focused on Tova Shook, the daughter of Sam Shook. On January 16, 1992, between 3:30 and 4:00 a.m., Special Agent Elliott took Sergeant Daniel Haas of the Oregon National Guard to the homes of Kyllo and Shook, where he used a thermal imaging device to detect the level of heat within the homes. Magistrate Judge Juba then issued two more warrants based on an affidavit prepared by Special Agent Elliott, to search the residence occupied by Tova Shook at 890 Rhododendron Drive, Florence, Oregon and the residence occupied by Kyllo at 878 Rhododendron Drive, Florence, Oregon. The applications for these two search warrants were patterned in a fashion similar to the affidavits for the four prior search warrants.

When the search warrants were executed, law enforcement officers found an indoor marijuana "grow" involving more than one hundred marijuana plants located in the residence at 878 Rhododendron Drive, and dried marijuana and indications that marijuana was being distributed at the residence located at 890 Rhododendron Drive.

On February 20, 1992, a federal grand jury indicted Kyllo for the crime of manufacturing marijuana based on the evidence located in his residence. On February 24, 1992, Kyllo entered a plea of not guilty. The matter was set for trial. On May 18, 1992, Kyllo filed this motion to suppress evidence.

On June 10, 1992, the court granted Kyllo's request for a *Franks* hearing, limiting the evidence to be received and the issues to be addressed to the statements claimed by Kyllo to be false as to the power usage at the residence located at 878 Rhododendron Drive. The court found that Kyllo had made a substantial showing that the part of the sworn statement of Special Agent Elliott which related to the power usage at the residence located at 878 Rhododendron Drive was made with reckless disregard for the truth, and that the part of the statement made with reckless disregard for the truth was essential to the determination of the magistrate judge that there was probable cause to issue the search warrant.

## CONTENTIONS OF THE PARTIES

Kyllo first contends that Magistrate Judge Juba was misled by deliberate false statements and omissions into issuing the warrant to search Kyllo's residence. Kyllo asserts that if the false statements were corrected or the false statements were excised from the affidavit in support of the search warrant, there would be no probable cause to issue the search warrant. Kyllo also contends that the warrantless use by law enforcement officers of a thermal imaging device constituted an unreasonable search and seizure, and that the use of the National Guard in civilian law enforcement is unlawful.

The government contends that none of the statements of Special Agent Elliott were false or misleading, and the information that Special Agent Elliott provided portrayed the facts as he believed them to be; that the use of a thermal imaging device does not constitute "a search;" and that the assistance of the National Guard was not a violation of the prohibition on military involvement in civilian law enforcement.

## APPLICABLE LAW

1. *Validity of the Search Warrant*

In *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978), the Supreme Court stated:

[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

■ If the court determines, as a result of a *Franks* hearing, that false statements were deliberately or recklessly included in the affidavit and that "the affidavit is insufficient to establish probable cause without the false material, the court must set aside the search warrant and suppress the fruits of the search." *United States v. Burnes*, 816 F.2d 1354, 1357 (9th Cir.1987).

This court granted to Kyllo a *Franks* hearing limited to the issue of whether the following statements of Special Agent Elliott as to the power that was used at the residence located at 878 Rhododendron Drive were made with reckless disregard for the truth in the affidavit that he prepared in support of the search warrant:

A subpoena for the power usage served on Central Lincoln PUD indicated the address of 878 Rhododendron Dr, Florence was in the name of Danny Kyllo. These records show that the power usage for the residence at 878 Rhododendron Dr. during the months of May through December held a usage that ranged from 730 Kilowatt Hours in the summer months gradually building to a high of 2206 Kilowatt Hours in winter.

. . . .

The Portland General Electric Company has developed a guide for estimating appropriate power usage relative to square footage, type of heating and accessories, and the number of people who occupy the residence. Using the Tax assessors report previously mentioned herein, the reported square footage of 540 square feet per each residence would be calculated as follows; The guide indicates a maximum power usage of 1348 KWH for a structure consisting of 1000 square feet, thus a structure of approximately half that square footage should generate a maximum power output of 674 kwh. The difference in maximum KHW's between the guide and the residences would indicate a[n] excessive power usage of 1532 kwh for 878 Rhododendron Dr., and a[n] excessive power usage of 1020 kwh for 890 Rhododendron Dr.

... In studying the power usage consumption for 878 Rhododendron Drive it appears that the power is consistently high, which would indicate that this address is consistent with having a continues [sic] marijuana grow operation.

Search Warrant Affidavit, pp. 4–5 (references to exhibits omitted).

Kyllo contends that at the evidentiary hearing, Special Agent Elliott deliberately misrepresented the purpose and function of the PGE chart, as well as what the chart actually means. Kyllo argues that Special Agent Elliott persuaded the magistrate judge that his conclusions were objectively made based on scientific facts provided by PGE, even though, according to Kyllo, Special Agent Elliott did not discuss the facts of this case or the PGE chart with anyone at PGE.

Kyllo contends that PGE has never held out its chart as establishing appropriate power usage, maximum power usage, or normal power usage, and that the magistrate judge was led to believe that PGE had done so by Special Agent Elliott in his affidavit. Kyllo contends that Special Agent Elliott took advantage of the magistrate judge's familiarity with Special Agent Elliott's prior applications for search warrants and did not fairly disclose to the magistrate judge the shortcomings of this particular affidavit.

Kyllo further submits that the affiant, Special Agent Elliott, distorted the conclusions that could be drawn from power records by taking one month's power usage out of context and making conclusions about that usage without consultation with any expert or knowledgeable individual in the energy field. Kyllo contends that no one can take an isolated month of power usage and fairly conclude that the usage was excessive because the usage that

month was above the monthly average. Kyllo also contends that his monthly average usage of power was actually below the average shown on the PGE chart; that the statistics from which the chart is derived are not adaptable to homes located on the Oregon coast; that the statistics have a built-in bias; and that energy consumption is a function of many individual factors, only one of which is the square footage of the residence, despite the fact that Special Agent Elliott informed the magistrate judge that a smaller house would use proportionately less power.

The government contends that Kyllo has not met his burden of showing that the statements made by Special Agent Elliott in the affidavit in support of the search warrant were deliberately false or made with reckless disregard for the truth. The government contends that the PGE chart used by Special Agent Elliott in his investigation has not been shown to be inaccurate, and that even assuming that the chart was inaccurate, Special Agent Elliott was not reckless in using the chart.

The government contends that while the experts produced by Kyllo agreed that it was improper to cut in half the figures on the PGE chart as Special Agent Elliott did, these same experts also agreed that a smaller home would use less power. The government argues that Special Agent Elliott was, at most, negligent in cutting in half the figures on the PGE chart, and that his action does not amount to recklessness, a deliberate disregard for the truth, or an intentional falsehood. The government contends that Kyllo has not shown that Special Agent Elliott acted with any intent to deliberately mislead the magistrate judge.

## ANALYSIS AND RULING

■ The court has carefully considered all of the evidence presented as to whether or not certain statements made by Special Agent Elliott in his affidavit in support of the search warrant as to the power usage at the residence located at 878 Rhododendron Drive were made by him with a reckless disregard for the truth.

Special Agent Elliott testified that he had used these same power charts in a number of prior cases to successfully predict whether or not there was marijuana growing at a particular location. Special Agent Elliott testified that he did not intend to mislead the magistrate judge by dividing the power usage in half, and that he believed that this was the correct thing to do at the time.

The court finds that Special Agent Elliott was credible when he testified that he believed PGE's power chart was accurate and that it was reasonable for him to use it. Special Agent Elliott testified that he made no deliberately false statements in his affidavit in support of the search warrant.

Special Agent Elliott investigated this case with Detective David Nafziger of the Oregon State Police Department. Detective Nafziger obtained PGE's power chart in June, 1991 from Detective Bert Royster of the Oregon State Police Department assigned to the Regional Crime Narcotics Enforcement Team. Detective Royster has a broad range of experience in drug investigations and provides training to other law enforcement officers. Under the facts and circumstances of this case, this court concludes that Special Agent Elliott did not act recklessly in using the information provided to him by Detective Nafziger and did not use this information in a reckless manner. Therefore, Kyllo's motion to suppress evidence on the grounds that the magistrate judge was deliberately or recklessly misled by false statements and omissions into issuing the warrant for the search of his residence is denied.

2. *Warrantless Use of a Thermal Imaging Device*

■ Kyllo contends that the use by law enforcement officers of a thermal imaging device to detect the heat emanating from his home without first obtaining a warrant to do so constituted an unreasonable search and seizure in violation of the Fourth Amendment.

"[T]he invasion of a constitutionally protected area by federal authorities is, as the Court has long held, presumptively unrea-

sonable in the absence of a search warrant." *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967). Technological progress since the Fourth Amendment was enacted has forced courts to expand this concept of a government "invasion" beyond purely physical intrusions to include non-physical invasions under certain circumstances: "[T]he use of sophisticated modern mechanical or electronic devices and the frightening implications of their possible development have led to abandonment of the test of physical trespass within the protected area and a broadening of protection to cover a 'reasonable expectation of privacy.'" *United States v. Solis*, 536 F.2d 880, 886 (9th Cir.1976).

■ Under *Katz*, an expectation of privacy is only reasonable where (1) the individual manifests a subjective expectation of privacy in the object of the challenged search; and (2) society is willing to recognize that subjective expectation as reasonable. *Id.* 389 U.S. at 361, 88 S.Ct. at 516. The second element turns on "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Oliver v. United States*, 466 U.S. 170, 182–83, 104 S.Ct. 1735, 1743, 80 L.Ed.2d 214 (1984).

Kyllo contends that he had a reasonable expectation of privacy in the heat generated within his home; that he did all he reasonably could do to contain the heat in his home; and that society "is well prepared to regard it reasonable that the citizenry not be surveilled by sophisticated electronic technology in order to detect personal lifestyles, including heat and cooling, within their homes." Memorandum of Law in Support of Motion to Suppress Evidence, p. 28.

The government contends that Kyllo did nothing to indicate his desire to protect his privacy in the heat generated within his home, and that even if the court found that Kyllo had a subjective expectation of privacy in the heat generated within his home, society would not consider that expectation reasonable. The government argues that heat generation is fundamentally different from telephone conversations, which were the subject of dispute in *Katz*, that by their nature are made with the expectation of privacy. The government argues that Special Agent Elliott's detection of the heat emanating from Kyllo's home is similar to the observation of smoke coming from the chimney of a house and inferring that the owner had a fire in the fireplace. The government contends that the detection of the heat emanating from Kyllo's home was not an intrusion into the home; that the detection of the heat lost to the outside of the home did not reveal intimate details as to the inside of the home; and that none of the interests which form the basis for the need for protection of the curtilage, namely the intimacy, the personal autonomy, and the privacy associated with a home, are threatened by thermal imagery.

This court agrees with the court in *United States v. Penny–Feeney*, 773 F.Supp. 220 (D.Haw.1991), which found that the use of a device to detect surface waste heat from a home does not amount to a "search" of the home within the meaning of the Fourth Amendment. *Id.* at 228. The court finds that the use of the thermal imaging device here was not an intrusion into Kyllo's home. No intimate details of the home were observed, and there was no intrusion upon the privacy of the individuals within the home.

Kyllo's motion to suppress evidence on the grounds that Special Agent Elliott's use of a thermal imaging device to detect the heat emanating from Kyllo's home without first obtaining a warrant constituted an unreasonable search and seizure in violation of the Fourth Amendment is denied.

### 3. Use of National Guardsman to Operate Thermal Imaging Device

■ Kyllo moves to suppress evidence based on his contention that the use of a member of the Oregon National Guard to enforce federal law in the State of Oregon is unlawful under the Posse Comitatus Act. Kyllo argues that the Oregon National Guard is a component of the federal Army National Guard, which cannot be used for domestic law enforcement without legisla-

tive approval. The government contends that National Guardsmen play a dual role as both federal and state employees but remain state employees, and thus are exempt from the restrictions of the federal Posse Comitatus Act unless they are called into federal service by the President of the United States.

Staff Sergeant Haas, who operated the thermal imaging device, is a member of the Oregon National Guard and is an employee of the State of Oregon until and unless he is called into federal service. The Commander-in-Chief of Staff Sergeant Haas is the Governor of the State of Oregon. The Supreme Court has recognized the dual nature of a National Guard and the fact that National Guardsmen only lose their status as a member of a state National Guard when they are "drafted into federal service by the President." *Perpich v. Department of Defense*, 496 U.S. 334, 344, 110 S.Ct. 2418, 2424, 110 L.Ed.2d 312 (1990). As a member of the Oregon National Guard, Staff Sergeant Haas is permitted to assist the federal government in law enforcement, as he did here. The National Guard is specifically authorized by Congress to assist in counter-drug activities when not drafted into federal service by the President. 32 U.S.C. § 112.

Kyllo's motion to suppress evidence on the grounds that it is unlawful to use a member of the Oregon National Guard in federal law enforcement in the State of Oregon is denied.

## CONCLUSION

The court finds that the statements made as to the power usage at the residence at 878 Rhododendron Drive, Florence, Oregon were not made with reckless disregard for the truth and, as such, should not be omitted from the affidavit in support of the search warrant; that the use of a thermal imaging device does not constitute an impermissible search under the Fourth Amendment; and that the use of a National Guardsman to operate the thermal imaging device was not unlawful.

Kyllo's motion to suppress evidence (# 30) is denied.

## ORDER ON RECONSIDERATION

The matter before the court is the motion of defendant, Danny Kyllo, for reconsideration of its order denying his motion to suppress evidence (# 61).

## BACKGROUND

On December 4, 1992, this court issued an opinion and an order based thereon denying the motion of Kyllo to suppress evidence. In its opinion, the court concluded that (1) the evidence presented to the court at the *Franks* hearing did not show that the magistrate judge was deliberately or recklessly misled by false statements and omissions into issuing the warrant for the search of Kyllo's residence; (2) under the facts of this case, the use of a thermal imaging device to detect surface waste heat emanating from Kyllo's home was not an intrusion into Kyllo's home requiring a search warrant; and (3) the use of the Oregon National Guard to enforce *federal* law in the State of Oregon was not unlawful and does not require the suppression of evidence seized pursuant to a valid search warrant.

Kyllo moves the court to reconsider its order denying his motion to suppress on the grounds that (1) a hearing should be conducted to consider further evidence and legal argument; and (2) a decision of the Circuit Court of the State of Oregon for the County of Harney in *State v. Binner*, Case Nos. 92–04–1789C, 92–04–1789C2, 92–04–1789C3 and 92–05–1790C, issued on November 9, 1992 should be considered.

The government opposes Kyllo's motion for reconsideration.

## ISSUES

(1) *Thermal Imaging Device*

After the *Franks* hearing was held, Kyllo filed the affidavit of Duane Hussey as an offer of proof regarding the intrusive nature of the thermal imaging device. Since the *Franks* hearing, Kyllo has also supplemented the record with the transcript of the witness in *State v. Binner*

who addresses the issue of the thermal imaging device as well as the issue of the use of the Oregon National Guard.

The court had considered the affidavit of Duane Hussey submitted by Kyllo prior to the ruling of December 4, 1992 and has reviewed the transcript of the proceedings as well as the opinion of the state court in *Binner*. Nonetheless, the court adheres to its conclusion that the use of a thermal imaging device to detect the heat emanating from Kyllo's home without first obtaining a search warrant does not constitute an unreasonable search and seizure in violation of the Fourth Amendment.

The court finds that the record adequately reflects the relevant legal and factual issues, and a further hearing is not required.

(2) *Use of Oregon National Guard*

This court adheres to its prior ruling that the use of a member of the Oregon National Guard to operate the thermal imaging device in this case does not require suppression of the evidence seized pursuant to a valid search warrant.

### CONCLUSION

Kyllo's motion for reconsideration of order denying motion to suppress (# 61) is GRANTED. The court has reviewed the opinion and transcript in *Binner* and the arguments of the parties and adheres to the order denying motion to suppress.

IT IS SO ORDERED.