Grasso, J.
Defendants are awaiting trial on indictments charging them with knowingly or intentionally manufacturing, distributing, dispensing or cultivating marijuana in violation of G.L.c. 94C, §32, and with conspiring to violate G.L.c. 94C, §40. They move to suppress physical evidence seized by police, on September 1, 1993, in the execution of a search warrant at 305 High Street, Ipswich. Defendants claim that the evidence seized was obtained in violation of their rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, Arts. 12 and 14 of the Declaration of Rights of the Massachusetts Constitution and Mass. G.L.c. 66, 66A, and 276.
For the reasons set forth below defendants, motion to suppress evidence is ALLOWED.
BACKGROUND
As taken from the search warrant application and supporting affidavits and from a stipulation of the parties, the factual background is as follows:
On September 1, 1993, Detective Theodore J. Le-Mieux (“LeMieux”) of the Ipswich Police Department applied for and received a warrant to search 305 High Street, Ipswich. LeMieux’s application culminated a lengthy investigation focusing on Ross Adams and his residence. In support of the warrant application Le-Mieux attached an affidavit describing information he received from an unnamed informant, from a named informant, from observations made by a forward-looking infrared system (“FLIR”), and from electric usage records and other police sources.
Specifically, LeMieux averred that a few days after being arrested in May 1993 for a drug offense, an individual named Renee Comeau had left a message on the Drug Task Force answering machine offering to give information about Ross Adams’s marijuana operation in return for assistance with her criminal case. LeMieux never contacted her to receive additional information. In August 1993 an anonymous male caller left information at the Cape Ann Drug Task Force that Adams was growing marijuana in his cellar. The caller said “When you get in there you will shit your pants.”
In his affidavit, LeMieux also mentioned that he had reviewed kilowatt usage records for 305 High Street at the Ipswich Electric Company and concluded that the high amount of electricity used was consistent with the operation of halide lights commonly used to grow marijuana. At the time LeMieux made this determination he was aware that there was a lobster business on the premises which included a lobster pool using large amounts of electricity.
On the evening of August 31, 1993, a helicopter equipped with a FLIR device flew over 405 High Street and “observed it to be giving off high amounts of heat from the right rear corner of the house . . . and observed the foundation of the house on the west side to be hot. . . and observed other homes in the area . . . did not exhibit the same elevated temperature as the Adams-Havener home.
Detective LeMieux also recited in his affidavit that almost two years earlier (September 23, 1991) he had received a telephone call from a Connecticut police officer. At that time the Connecticut officer stated that a few days earlier he had arrested convicted drug user Ross Adams for various drug offenses. Also Lemieux recited that earlier in 1991 (May), a DEA agent had told him that Adams’s name appeared on the Green Merchant List, a log of people who had purchased items for growing plants indoors. LeMieux listed the names of five other persons on this list whom police had found to be growing marijuana.
The parties have filed a stipulation with respect to the surveillance by the FLIR device. The parties agree that the FLIR device detects differences in the temperature of an object being observed which are undetectable by the human senses. When the eye of the FLIR is focused on an object, an image is immediately *239 displayed in real-time on a small TV type screen. The FLIR device detects and records heat sources inside a structure. In this case, while flying, without lights, at an altitude of 800 to 1000 feet above ground level, the FLIR device operator obtained readings of the defendants’ home on August 31, 1993 between 9:37 p.m. and 9:40 p.m.
DISCUSSION
I. The Warrantless Use of the FLIR Device
“For the purpose of art. 14, as for the Fourteenth Amendment, whether a particular instance of government scrutiny, unauthorized by a warrant, constitutes an unreasonable search under constitutional standards, depends on whether the person had a ‘reasonable expectation of privacy.’ ” Commonwealth v. One 1985 Ford Thunderbird Automobile, 416 Mass. 603, 607 (1993), quoting Commonwealth v. Panetti, 406 Mass. 230, 234-35 (1989) (defendant had a reasonable expectation of privacy in crawl space beneath the floor of his home, and, therefore, conversations overheard by police officers constituted a search): see also California v. Ciraolo, 476 U.S. 207, 211 (1986).
A Fourth Amendment search does not usually occur when police use extrasensory, nonintrusive equipment. U.S. v. Place, 462 U.S. 696 (1983) (dog sniff is not a Fourth Amendment search): Smith v. Maryland, 442 U.S. 735 (1979) (a phone company “pen register” is not a Fourth Amendment search): U.S. v. Penny-Feeney, 773 F.Supp. 220, 226 (D.Haw. 1991); U.S. v. Knotts, 460 U.S. 276 (1983) (beeper tracking movements of vehicle not Fourth Amendment search); Commonwealth v. Doulette, 414 Mass. 653, 655 (1993) (where police officer illuminated car interior with flashlight, no search occurred).
Mere aerial surveillance at an altitude of four hundred feet is not a Fourth Amendment search, and is permissible under art. 14 without a warrant. Florida v. Riley, 488 U.S. 445 (1989); California v. Ciraolo, supra; One 1985 Ford Thunderbird Automobile, supra at 610. “[A]t least when the police have a reasonable suspicion that illegal activiiy is occurring in a backyard, and engage in brief, foreseeable aerial surveillance from a reasonable altitude, where they have a right to be, it has not been demonstrated that an objectively reasonable expectation of privacy has been violated.” One 1985 Ford Thunderbird Automobile, supra.
Whether the warrantless use of a FLIR device violates state and federal constitutional principles has not been definitively determined by Massachusetts appellate courts.[2] In ascertaining the individual's expectation of privacy, courts consider (1) “whether the police had a lawful right to be where they were”; (2) “whether the public had access to, or might be expected to be in, the area from which the surveillance was undertaken”; (3) “the character of the area (or object) which was the subject of the surveillance.” One 1985 Ford Thunderbird Automobile, supra, citing Panetti, supra at 234; Commonwealth v. Blood, 400 Mass. 61, 70 (1987); Commonwealth v. Mamacos, 409 Mass. 635, 639-40 (1991), and Commonwealth v. Price, 408 Mass. 668, 672-73 (1990).
The parties have stipulated that the helicopter equipped with the FLIR device focused on the defendants’ home from an altitude of 800 feet. Significantly lower altitudes of400 feet to 700 feet have been deemed permissible for warrantless aerial surveillance. Id.; Florida v. Riley, supra; One 1985 Ford Thunderbird Automobile, supra at 610. Accordingly, the police had a lawful right to fly over the defendants’ premises at an altitude of 800 feet. Moreover, the public may be expected to be present in the navigable airspace 800 feet above the defendants’ home in which the surveillance occurred.
Unlike the sensory-enhancing devices previously deemed constitutionally permissible, the FLIR device does not improve the sensory perceptions of a human. Rather, the FLIR device allows Its operator to view an image of heat. With the exception of looking at smoke, the human eye is not capable of seeing gradations of heat present within or emanating from a structure. Troubling, too, is the fact that this device penetrates through walls to reveal a picture of temperature differentiations, and thereby, presents a hint of the activities occurring within a building. By its intrusive nature, the FLIR device seriously impinges upon a person’s expectation of privacy within his home.
In this case “the area (or object)” which was the subject of the surveillance was the defendants’ home. Traditionally, privacy interests are greatest within one’s home, an area having a heightened expectation of privacy. Donovan v. Dewey, 452 U.S. 594 (1981); Commonwealth v. Blood, 400 Mass. 61, 70 (1987). Police focused the FLIR device upon the defendants’ home, an area which has a heightened expectation of privacy.
After looking at the relevant circumstances, this court concludes that the surveillance by the FLIR device constituted an invasion of the defendants’ reasonable expectation of privacy. Because use of a FLIR device constituted a search triggering Fourth Amendment protection, Detective LeMieux should have procured a warrant prior to conducting the FLIR fly-over. To conform with constitutional mandates, the results of the FLIR investigation must be excised from the affidavit of Detective LeMieux.
II. The Search Warrant
Defendants argue that after redaction of the FLIR results from the affidavit, the affidavit lacks probable cause. To establish probable cause, an affidavit must “contain enough information for the issuing magistrate to determine that the items sought are related to the criminal activiiy under investigation, and that they may reasonably be expected to be located in the place to be searched.” Commonwealth v. Fenderson, 410 *240 Mass. 82, 88 (1991), quoting Commonwealth v. Cefalo, 381 Mass. 319, 328 (1980). In reviewing the warrant application to determine whether probable cause to issue the warrant existed, the court should read the affidavits in an ordinary, common-sense manner without hypertechnical analysis. Commonwealth v. Melendez, 407 Mass. 53, 60 (1990) (Greaney, J., dissenting), citing United States v. Ventresca, 380 U.S. 102, 109 (1965). Only facts revealed on the face of the affidavit and any reasonable inferences may be considered. Commonwealth v. Allen, 406 Mass. 575, 578 (1990).
Information supplied to the affiant by second-hand sources must satisfy the Aguilar-Spinelli test before a magistrate may find probable cause to issue the search warrant. Aguilar v. Texas, 378 U.S. 108 (1964), Spinelli v. United States, 393 U.S. 410 (1964); Commonwealth v. Upton, 394 Mass. 363, 374 (1985). Under the Aguilar-Spinelli standard, the affidavit must set forth the source’s basis of knowledge and veracity. Id.
An informant’s basis of knowledge may be satisfied if he received his information through personal observation. Commonwealth v. Spano, 414 Mass. 178, 185 (1993). If an informant personally participated in criminal activity with the defendant, the basis of knowledge prong is satisfied. Commonwealth v. Mejia, 411 Mass. 108, 111 (1991); Commonwealth v. Montanez, 410 Mass. 290, 299 (1991) (basis of knowledge established where informant bought cocaine from the defendant); Commonwealth v. Amral, 407 Mass. 511, 514 (1990) (basis of knowledge test satisfied where informant observed contraband in the place to be searched).
If the affidavit to a search warrant asserts that a confidential informant has provided information in the past, leading to the arrest and conviction of a named individual, the veracity prong of the Aguilar-Spinelli test is satisfied. Commonwealth v. Byfield, 413 Mass. 426, 531 (1992); Amral supra; Commonwealth v. Santana 403 Mass. 167, 170 (1988). Police corroboration of a confidential informant’s tip may bolster the tip’s reliability. Byfield, supra.
A named informant carries a presumption of reliability. Commonwealth v. Bakoian, 412 Mass. 295, 301 (1992), citing Commonwealth v. Atchue, 393 Mass. 343, 347 (1984).
i.Anonymous Tip
The anonymous tip received by the Cape Ann Drug Task Force fails both prongs of the Aguilar-Spinelli test. First, Detective LeMieux did not know the identity of the male caller, and therefore, the tipster’s remarks carry no indicia of reliability. Second, the unidentified informant did not assert that he personally had observed criminal activity. Therefore, the basis of knowledge prong of the Aguilar-Spinelli test is not met.
ii.Renee Comeau’s Message
As a named informant, Renee Comeau is presumed to satisfy the veracity prong of Aguilar-Spinelli However, the reliability of the information provided by Comeau is vitiated by the circumstances. The attendant circumstances reveal that Comeau was providing information in her own self-interest. She expressly stated that she wished to provide information to the police in exchange for a deal on her pending criminal charge.
Moreover, Comeau failed to state her basis of knowledge. While offering to provide police information concerning Adams’s marijuana operation, she did not state that she personally observed the criminal activity. Her message does not satisfy the Aguilar-Spinelli test. Additionally, her message regarding Adams’s marijuana operation did not corroborate the anonymous tip’s information indicating that Adams cultivated marijuana in his cellar. Comeau’s message provides little detail and has slight corroborative value.
iii.Prior Arrest
A defendant’s prior criminal history, if recent and sufficiently similar, may be considered in the determination of probable cause. “A law enforcement officer who provides information is presumed credible.” Commonwealth v. Watson, 36 Mass.App.Ct. 252, 253 n. 1 (1994).
In 1991, Detective LeMieux received information from a Connecticut police officer that Adams, a convicted drug user, had again been arrested for drug offenses. Adams pled guilty to the charges on April 4, 1992. The time frame and the nature of the offenses charged to Adams in the past provide some basis for the belief that Adams may have been involved in a pattern of drug-related criminal activity.
iv.Green Merchant List
The fact that Adams’s name appears on a so-called Green Merchant List raises nothing more than a mere suspicion of criminal activity, and contributes little, if any, to the probable cause determination.
v.Electric Usage Records
The defendants argue that Detective LeMieux unlawfully obtained the defendants’ electric usage information without a warrant. This court is not persuaded that a person has a reasonable expectation of privacy in his electric usage records. Meter readers, accountants, and many other electric company employees have access to information regarding an individual’s use of electricity.[3] Because there is widespread access to such records, and the intrusion on an individual’s privacy rights is slight, police need not obtain a search warrant prior to obtaining them.
Nevertheless, electric usage records have little value without empirical data and comparison. In the instant case, the defendants’ operation of a lobster pool business may have been a logical explanation for *241 usage levels higher than those of neighboring houses. A reasonable magistrate may not infer that high electric usage levels, alone, indicate that the defendant operated a marijuana cultivation operation. Too many other possibilities for high consumption exist. High electric usage, therefore, only supplies a mere suspicion that criminal activity is afoot.
After redacting the results of the FLIR test, and examining the remaining portions of Detective LeMieux’s affidavit, this court concludes that the magistrate lacked probable cause to issue the search warrant. Because police had no other lawful justification to conduct the search, the evidence seized by police on September 1, 1993 at 305 High Street in Ipswich must be suppressed.
ORDER
For the foregoing reasons, defendants’joint motion to suppress evidence is hereby ALLOWED.

 See State v. Young, 867 P.2d 593 (Wash. 1994) (warrantless use of FLIR is constitutionally impermissible); U.S. v. Ishmael, 853 F.Supp. 205 (E.D. Tex. 1994) (FLIR use is a search). See also the following cases in which use of FLIR device not determined to be a search; U.S. v. Porco, 842 F.Supp. 1393 (D.Wyo. 1994); U.S. v. Kyllo, 809 F.Supp. 787 (D.Or. 1992); U.S. v. Penney-Feeney, 773 F.Supp. 220 (D.Haw. 1991); State v.McKee, 510 N.W. 807 (Wis.Ct.App. 1993); State v. Cramer, 851 P.2d 147 (Ariz.Ct.App. 1992).

 G.L.c. 164, §116 authorizes officers or servants of the electric company to enter premises supplied with electricity to examine and maintain electric meters. The statutes regulating electric companies do not contain provisions regarding the protection or confidentiality of electric usage records. The Legislature did not create a protection or privilege for such records. Access to electric usage records may be distinguished from the interception of wire or oral communications in which police must first obtain a warrant pursuant to G.L.c. 272, §99. No warrant is required for the less intrusive procurement of electric usage records.