**UNITED STATES of America, Plaintiff,**

**v.**

**Mark Allen DOMITROVICH, Defendant.**

**No. CR–93–295–FVS.**

United States District Court,
E.D. Washington.

Feb. 23, 1994.

On Second Motion to Suppress
March 24, 1994.

Phillip J. Wetzel, Spokane, WA, for defendant.

Earl A. Hicks, U.S. Atty. Office, Spokane, WA, for U.S.

## ORDER DENYING MOTIONS

VAN SICKLE, District Judge.

**THIS ORDER** memorializes three oral rulings. The Court denied the defendant's request for a *Franks* hearing[1] (Ct.Rec. 20); denied his motion to reconsider (Ct.Rec. 29); and denied his motion to suppress (Ct.Rec. 20).

Although the Court did not hold a *Franks* hearing, the defendant's motion to suppress was the subject of an evidentiary hearing. The defendant and his attorney, Mr. Phillip J. Wetzel, were present. The government was represented by Assistant United States Attorney Earl A. Hicks.

## I. BACKGROUND

Gary D. Landers has worked as a Special Agent for the Drug Enforcement Administration since 1983. He has received extensive training in the investigation of controlled substance violations. His primary function as a DEA agent has been to conduct such investigations.

On October 27, 1993, Agent Landers requested permission to search two separate locations for evidence of a marijuana grow. One is situated at 7703 Scotia Road, Newport, Washington; the other at North 9111 Country Homes Boulevard, Spokane, Washington. Based upon Landers' affidavit, a magistrate judge issued a search warrant. It was executed on October 29. A large marijuana grow operation was uncovered at 7703 Scotia Road.

The defendant has filed a number of motions challenging the admissibility of evidence. Three issues are addressed in this order: (1) whether the defendant is entitled to a *Franks* hearing; (2) whether certain observations which Agent Landers made during the course of an entry upon the premises at 7703 Scotia Road violated the Fourth Amendment; and (3) whether Landers obtained public utility power consumption records in violation of state law.[2]

## II. *FRANKS* HEARING

### A. Summary of Agent's Affidavit

Agent Landers supported his request for a search warrant with a thirteen-page affidavit. The main points are summarized below:

One of Landers' colleagues interviewed an informant during December, 1988. The informant said the defendant was operating a body shop in Spokane known as J & M Automotive. According to the informant, the defendant was cultivating marijuana at some large, indoor grow, and selling it at J & M Automotive. Landers checked out the informant's statements. He learned that the defendant had, in fact, operated a business by that name in Spokane.

Agent Landers discovered that Kimberly Domitrovich operated a Spokane business known as Solar Eclipse Tanning Salon. It was located at North 9111 Country Homes Boulevard. Both Mark Domitrovich and Kimberly Domitrovich listed that address on their driver's licenses.

---

1. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

2. The defendant's final contention may be disposed of quickly. Evidence which is obtained in a manner consistent with federal law is admissible in federal court regardless of state law. *United States v. Chavez–Vernaza,* 844 F.2d 1368, 1374 (9th Cir.1987). Since Agent Landers obtained the disputed power consumption records by means of a subpoena authorized by federal law, *see* 21 U.S.C. § 876 (1993), he was permitted to refer to them in his affidavit.

Solar Eclipse Tanning Salon had been burglarized during January, 1992. By the end of the month, one Brian J. Zinsky had confessed to the crime. According to Landers' affidavit, Zinsky was a former employee who burglarized the tanning salon in an effort to find drugs. He reportedly said that Kimberly Domitrovich kept drugs on the premises, and that he had seen them on "numerous occasions." Although Zinsky confessed, Ms. Domitrovich asked that he not be prosecuted. Her request was honored.

From 1992 through October, 1993, the manager of the complex in which Solar Eclipse was located contacted a local detective periodically. He repeatedly advised the detective that other tenants were complaining that "drug-affected people" and "short-term visitors" were frequenting the salon.

During October, 1993, Landers received information regarding the Domitroviches from Doug Malby, the Pend Oreille County Sheriff. Malby said he had received complaints from two sources. One source said the Domitroviches were selling marijuana out of their tanning salon; the other said they had dug a deep pit on their property at 7703 Scotia Road. According to the second source, the pit was later covered by a small shed.

Landers went to the county assessor's office. Based upon his research there, he reported that Mark Domitrovich and Kimberly Domitrovich owned slightly over two acres of land at 7703 Scotia Road.

Spokane County Sheriff's Department detective Cal Walker flew over the premises in a helicopter on October 6, 1993. The helicopter was equipped with a forward looking infrared device. At some point after the flight, the detective told Landers that a structure adjacent to the main residence appeared to be producing extremely large quantities of heat.

Landers went to the premises on the night of October 20. At about 1:30 a.m., he drove up the driveway. He saw two vehicles. One was registered to August Domitrovich; the other to Mark Domitrovich.

Thereafter, Landers drove back down the driveway and found a place to park his vehi-cle. He then re-approached the east side of the premises on foot. He said he walked around the "perimeter of the curtilage."

While on the south side of the property, Landers observed a 20–by–20 lean-to surrounded by a wooden fence. The lean-to was about 60 feet from the residence. Landers noticed an 8–by–10 storage shed under the north end of the lean-to. Bales of hay had been stacked behind the shed. The stack was approximately 10–by–10–by–10. It appeared to Landers that the hay had been stacked in a manner which left air spaces between the bales.

From a position 30 feet south of the haystack, Landers could hear the sound of an exhaust fan coming from the direction of the bales. In Landers' experience, such fans are commonly associated with indoor marijuana grow operations. Landers thought he smelled the odor of marijuana, but couldn't be sure because of the hay.

Landers scanned the bales of hay with a thermal imaging device. Later that morning, after leaving the premises, he scanned a different hay stack. The comparison indicated an unusually intense source of heat within the baled hay.

In addition, Lander's affidavit states that he checked power consumption records for 7703 Scotia Road. Although he freely conceded that he did not know exactly what electrical appliances or devices were being operated on the premises, Landers opined that enough power was being consumed to support an artificial lighting system of the type used to cultivate marijuana.

### B. Ruling Regarding Franks Hearing

When a search warrant is supported by an affidavit which appears to be valid, the affiant's veracity is subject to judicial inquiry only if the defendant makes a substantial preliminary showing that the affiant deliberately or recklessly included a false statement in the affidavit, and the statement is material to the magistrate's finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978); *United States v. Garcia-Cruz*, 978 F.2d 537, 541 (9th Cir.1992), *cert.*

*denied,* —— U.S. ——, 113 S.Ct. 2453, 124 L.Ed.2d 669 (1993). *Franks* has been extended to include deliberate or reckless omissions. *United States v. Stanert,* 762 F.2d 775, 781, *amended,* 769 F.2d 1410 (9th Cir. 1985). Thus, the defendant may qualify for a *Franks* hearing if he can establish, by a preponderance of the evidence, that Agent Landers deliberately or recklessly omitted facts from the affidavit which were necessary to prevent the affidavit from being misleading, and that had Landers added the facts to the affidavit, the magistrate would have been unable to find probable cause. *United States v. Ippolito,* 774 F.2d 1482, 1486 n. 1 (9th Cir.1985).

### 1. Alleged misstatements or omissions

Here, the defendant cites seven alleged misstatements or omissions. They are as follows:

First, the affidavit implies that Mark Domitrovich and Kimberly Domitrovich are married. According to the defendant, they are not. Miss Domitrovich's true name is Kimberly Macklin.

Second, in the defendant's opinion, the affidavit implies that both Domitroviches operated the tanning salon. The defendant insists that he was not involved.

Third, the affidavit states that Brian J. Zinsky was once employed by Kimberly Domitrovich. The police reports regarding the burglary do not say that.

Fourth, the affidavit states that Pend Oreille County Sheriff Doug Malby was informed that the Domitroviches dug a pit on their property at 7703 Scotia Road and covered it with a small shed. According to the defendant, the affidavit failed to disclose that the report of the pit was one and one-half years old. Furthermore, Sheriff Malby allegedly does not recall telling Landers that the pit was covered with a shed.

Fifth, the affidavit says the defendant owned the premises which Agent Landers

sought to search. Although the defendant concedes he occupied the residence,[3] he insists he did not own it. The owner is a person named Larry Smith.

Sixth, the affidavit refers to power consumption at 7703 Scotia Road, but does not say who paid the bills. The defendant alleges that Agent Landers knew that Mr. Smith paid the bills, but withheld that information from the magistrate.

Seventh, Agent Landers spoke with Cal Walker, an investigator for the Spokane County Sheriff's office, prior to applying for the search warrant. Landers knew that the sheriff's office had sent an undercover officer to the tanning salon in an effort to turn up evidence of drug distribution. The officer was unable to uncover anything.

### 2. Analysis of defendant's allegations

■ Insofar as marital status is concerned, the defendant and Miss Macklin held themselves out as husband and wife. For example, they used the same last name and listed a common address on their driver's licenses. Although Lander's affidavit may be technically inaccurate, it captures the intimate nature of their relationship.

■ Next, the defendant complains that the affidavit misrepresents his involvement in the tanning salon, imputing to him a role he never had. In that regard, he appears to be referring to a section near the beginning of the affidavit in which Agent Lander's summarizes his allegations.[4] The summary states, in part, that the "DOMITROVICH'S [sic] operate a business known as SOLAR ECLIPSE TANNING SALON...."

It is important to note that Lander's summary is not the affidavit's last word on the tanning salon. A subsequent section deals with that topic in greater detail.[5] Not only does the subsequent section list Miss Macklin

---

**3.** *See* Affidavit of David Prescott, Investigator (Ct. Rec. 23) at 1–2 ("I [David Prescott] have determined that there is a residence in the vicinity of 7703 Scotia Road, Newport, Washington, which was the one occupied by Mark Domitrovich on October 29, 1993).

**4.** (Affidavit at 2–3.)

**5.** (Affidavit at 9–10.)

as the owner,[6] but it makes no reference to the defendant.

■ The defendant's third and fifth complaints involve alleged inaccuracies. According to the defendant, Brian Zinsky never worked at the tanning salon, and the defendant does not own the premises at 7703 Scotia Road.

These inaccuracies appear to be the result of honest mistakes. Because Zinsky claimed to have "inside" information about Miss Macklin's establishment, Agent Landers could have honestly (if mistakenly) assumed that Zinsky had worked there. Likewise, a person who lacks training in title searches may misidentify the owner of a parcel of property, especially when the parcel is located in a rural area.

■ The defendant's fourth, sixth, and seventh complaints involve alleged omissions. According to the defendant, Agent Landers withheld information regarding the pit which had been dug on the property; the identity of the person paying the power bills; and the fact that a separate undercover operation had failed to turn up evidence of drug use or distribution at the tanning salon.

Alleged omissions must be viewed in context. An officer preparing an affidavit does not have either the time or the space to recite everything he knows about the criminal activity he is investigating. He must summarize the results of his investigation. That means a conscious decision to omit information which the officer deems cumulative or superfluous.

Every affidavit will omit facts which, in retrospect, seem significant. In some instances, the officer's failure to include information may be the product of negligence. That does not mean a reviewing court should venture beyond the four corners of the affidavit. It is well established that omissions or misstatements which are the result of mere negligence will not trigger a *Franks* hearing. *See, e.g., United States v. Dozier,* 844 F.2d 701, 705 (9th Cir.1988) (affiant overstated extent of defendant's prior convictions,

and included fact which affiant's investigation had shown to be untrue), *cert. denied,* 488 U.S. 927, 109 S.Ct. 312, 102 L.Ed.2d 331 (1988); *United States v. Miller,* 753 F.2d 1475, 1478 (9th Cir.1985) (affiant failed to uncover informant's perjury conviction).

The defendant asserts that the information omitted from the affidavit might have led the magistrate to question whether illicit activities were still occurring at either place Agent Landers sought to search, and whether he (the defendant) was actually residing at 7703 Scotia Road. Considered by themselves, the omissions seem to support the defendant's assertions. When viewed against the backdrop of the entire affidavit, however, it is clear that they were not seriously misleading.

More importantly, even if the magistrate had been presented with an affidavit which avoided every error now alleged by the defendant, she would have had little difficulty finding probable cause. Thus, the mistakes and omissions cited by the defendant are not material, and do not necessitate a *Franks* hearing. *See Garcia–Cruz,* 978 F.2d at 541.

### III. CURTILAGE

#### A. Findings

Although the defendant's request for a *Franks* hearing was denied, the Court conducted an evidentiary hearing to determine whether information presented to the magistrate judge was obtained by means of an unconstitutional entry upon the premises at 7703 Scotia Road. Based upon that hearing, the Court makes the following findings of fact:

During October, 1993, Agent Landers was contacted by Pend Oreille County Sheriff Doug Malby. Malby said that he had been informed that the defendant was selling marijuana at a tanning salon in Spokane. Malby also said that the defendant lived at 7703 Scotia Road, Newport, Washington; that a pit had been dug on the premises; and that the defendant had covered the pit with a small shed.

---

**6.** Interestingly enough, Miss Macklin used the name Kimberly Domitrovich when identifying

the owner of the business.

Landers began an investigation. Among other things, he drove to 7703 Scotia Road on the eighteenth or nineteenth of October. The residence is some distance from the county road. To get to it, Landers would have had to proceed up a private driveway.

The driveway angles southeast from a county road. It is about 750–1000 feet long. There is a gate about half way, with fences extending on either side. On his first trip to the premises, Landers noted that the occupants had left the gate open. Landers did not drive up the driveway, however, fearing that he might be observed.

Landers returned to 7703 Scotia Road at about 1:30 a.m. on October 20. The gate was open, so he drove up the driveway. He passed a small "No Trespassing" sign along the way.

The driveway leads to an approximately 155 foot by 185 foot parking area. The residence is immediately east of the parking area. Two separate outbuildings are located south of the parking area. One of the outbuildings is a detached garage; the other is a lean-to.

There were two vehicles parked near the house. The (low) beams from Landers' vehicle illuminated their license plates. After jotting down license plate numbers, Landers drove back to Scotia Road and parked his vehicle.

Landers was equipped with infrared night goggles and a thermal imaging device. The latter is an instrument which is capable of measuring differences in temperature on the surface of an object. At various times that evening, Landers used the device to monitor heat emissions.[7]

When Landers left Scotia Road, he was north and east of the residence. He hiked south from Scotia Road along a game trail which meandered through the woods, skirting along a neighbor's fenced fields. The first building which Landers approached was the residence. To avoid detection, Landers went no closer than the edge of the woods,

which is approximately 62 feet from the back of the house.

Landers then traversed clockwise through the woods to a spot south of the lean-to. It is 53 feet from the residence to the lean-to. Immediately south of the lean-to, the woods begin and the ground slopes steeply away. At that point, Landers was 32 feet south of the lean-to, and 105 feet from the house.

Landers noticed a stack of hay bales under the lean-to. He could hear the sound of an exhaust fan coming from that direction. It was quite distinctive because there were few other man-made noises at that hour of the night. Landers thought he smelled the odor of marijuana, but could not be sure because of the hay.

Before moving on, Landers used the thermal imaging device to monitor heat emissions from the stacked hay. He found that a significant quantity of heat was escaping from the bales.

Landers continued his clockwise trek, dodging between the outbuildings and a doghouse. Eventually, a dog began to bark. Landers retraced his steps and returned to his vehicle.

Unbeknownst to Landers, Deputy Cal Walker, an investigator for the Spokane County Sheriff's Office, had received information that the defendant was growing marijuana at a multi-leveled, underground site, and that he was selling it in Spokane. Walker traced the defendant to 7703 Scotia Road, making six or seven trips to the premises during late summer or early autumn. The driveway gate was open on all but one occasion, and in that instance, it had been closed only partially.

Deputy Walker also conducted aerial surveillance. One flight was in a fixed-wing aircraft. Another was in a helicopter. The helicopter flight occurred on October 6, 1993. Walker arranged to have a forward looking infrared device ("FLIR") mounted on the helicopter. Like the hand-held device Agent Landers carried, the FLIR detects differences in temperature on the surface of ob-

7. The only instance of thermal imaging which is at issue here is the one which occurred while Landers was standing south of the lean-to. Con-

sequently, the Court has not made findings with respect to other instances of thermal imaging.

jects. During the flight on October sixth, the helicopter made three passes over 7703 Scotia Road. The FLIR revealed that a structure on the premises—other than the residence—was emitting large quantities of heat.

At some point after Lander's October twentieth trip to the property, he learned of the investigation being conducted by the Spokane County Sheriff's Office. Lander compared notes with Walker, and incorporated some of Walker's observations into the affidavit which he submitted in support of his application for a search warrant.

In moving to suppress, the defendant has insisted that he excluded meter readers from his property. That is not accurate. The meter was read 25 times during the approximately two-year period prior to October, 1993. Fifteen readings were made by public utility employees; 8 by the defendant. On two occasions, the meter reader was "snowed out."[8]

The meter is located on the back side of the residence. To get to it, meter readers had to drive up the driveway, park in front of the residence, and walk around back. Meter readers were afforded unrestricted access to the area around the residence while going to and from the meter.[9]

### B. Open Fields Versus Curtilage

■ The Fourth Amendment does not protect the merely subjective expectation of privacy. To the contrary, it extends only to those expectations which society is prepared to recognized as legitimate. *Oliver v. United States,* 466 U.S. 170, 177, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984) (internal quotation marks and citations omitted).

Insofar as open fields are concerned, it is now well established that "there is no societal interest in protecting the privacy of those activities ... that occur" in such areas. *Id.* at 179, 104 S.Ct. at 1741. Consequently, the government's intrusion upon open fields "is not one of those 'unreasonable searches' pro-

scribed by the text of the Fourth Amendment." *Id.* at 177, 104 S.Ct. at 1740.

■ A property owner may not extend the scope of the Fourth Amendment by posting "No Trespassing" signs at the boundaries of an open field. As the Supreme Court has noted, the law of trespass is not coextensive with the Fourth Amendment. *Id.* at 183–84, 104 S.Ct. at 1744. Thus, while posting such signs may reflect a subjective expectation of privacy, *United States v. Roberts,* 747 F.2d 537, 541 (9th Cir.1984), it is not one which society recognizes as reasonable. *Id.*

■ Although the Fourth Amendment does not reach open fields, it does protect a dwelling's "curtilage." That is, the zone around a residence which may properly be treated as the home itself. *United States v. Dunn,* 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987). To qualify as curtilage, an area must be one which "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *Id.* (internal quotation marks and citations omitted).

■ There are at least four factors which bear upon curtilage determinations. They are as follows: (1) the proximity of the area claimed as curtilage to the home itself; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. *Id.* at 301, 107 S.Ct. at 1139. These factors are not a "laundry list," however, nor are they to be construed as a formula which will yield a "correct" answer in every situation. *Id.* at 301, 107 S.Ct. at 1139. The Supreme Court specifically cautioned lower courts not to apply these factors in a mechanical fashion.

Given the considerations cited in *Dunn,* it is clear that curtilage questions are fact driven. The answer will vary from case to case. *United States v. Depew,* 8 F.3d 1424, 1426

---

**8.** *See* Government's Exhibit 23.

**9.** The defendant may have given a key to the driveway gate to the local public utility company.

However, the Court cannot determine whether (or under exactly what circumstances) the key was used.

(9th Cir.1993). Nevertheless, a review of existing decisions is helpful.

In *Dunn,* DEA agents began tracking shipments of materials often used to manufacture amphetamine and phenylacetone, two controlled substances. At one point, the agents trailed a suspect who was transporting a chemical container in his pickup. They followed him to a 198–acre ranch. Later, by means of aerial surveillance, the agents learned that the pickup had been backed up to a barn.

The ranch was encircled by a multiple-strand, barbed wire fence. The ranch house, a small greenhouse, and two barns were located one-half mile from the nearest public road. The residence and greenhouse were surrounded by a separate barbed wire fence. The two barns were situated roughly fifty yards outside that fence.

One evening, two law enforcement officers walked to a point midway between the ranch residence and barns. (To get there, they had to cross the perimeter fence and one interior fence.) One of them smelled the odor of phenylacetic acid.

The officers looked into both barns, crossing fences in the process. While peering into the larger of the two barns, the officers thought they observed a phenylacetone laboratory. The officers did not enter the barn; instead, they left. However, the officers returned to the ranch on two subsequent occasions early the next day to confirm the existence of the laboratory. They then applied for (and received) a search warrant. *Dunn,* 480 U.S. at 297–98, 107 S.Ct. at 1137–38.

The Supreme Court concluded that the areas of the ranch which the officers had entered were not part of the dwelling's curtilage. First, the barns were sixty yards from the residence. They were fifty yards from the interior fence surrounding the residence and the greenhouse. Second, the fact that the occupants had placed an interior fence around the residence and greenhouse suggested that the curtilage ended at the fence. Third, the officers obtained objective data which indicated that the barns were being used in a manner inconsistent with domestic life. Not only did the officers have aerial photographs of the pickup parked next to the barn, *but while they were on the defendant's property,* they heard noises and smelled odors which suggested the manufacture of controlled substances. Fourth, the defendant had done little to shield the barns from the gaze of observers standing in adjacent open fields. *Dunn,* 480 U.S. at 302–03, 107 S.Ct. at 1140.

The Ninth Circuit has applied the *Dunn* factors on several occasions. In *United States v. Traynor,* 990 F.2d 1153 (9th Cir. 1993), law enforcement officers drove up a private road until they came to a locked gate and a "No Trespassing" sign. Since no fences were attached to the gate, and there were beaten paths around both ends, the officers walked around the gate and on down the driveway until they came to a residence and a shop. Ultimately, both officers heard a buzzing sound coming from inside the shop which they associated with an artificial lighting system. They also smelled the odor of marijuana. As a result, the officers left and obtained a search warrant. *Id.* at 1155.

The Court of Appeals rejected the defendant's curtilage arguments. First, the shop was 75 feet from the residence. Second, the only interior fence was one which partially enclosed the shop. The officers stayed out of that area. Third, the officers went to the defendant's place to investigate a tip that he was growing marijuana. The sounds and smells which the officers detected while near the defendant's shop confirmed that the shop was not being used in the manner a home would be. Fourth, the defendant had taken no steps to block the shop from the view of a person standing on adjacent property. *Id.* at 1158.

In *United States v. Brady,* 993 F.2d 177 (9th Cir.1993), the outbuilding was only forty-five feet from the residence. There was a perimeter fence (which law enforcement officers apparently crossed), but no interior fences. As in *Traynor,* the officers heard the buzz of electrical equipment inside the outbuilding, and smelled marijuana. Finally, the outbuilding was "easily visible" from open fields surrounding the defendant's property. *Id.* at 178–179. On those facts, the Court of Appeals held that the district

court had not erred by ruling that outbuilding was not part of the curtilage. *Id.* at 179.

The most recent published opinion is *United States v. Depew, supra.* There, a different circuit court panel ruled that a district court had erred by finding that the defendant's detached garage was not part of the curtilage of his residence. 8 F.3d at 1428.

Mr. Depew was a practicing nudist. He had taken a number of steps to protect his privacy. 8 F.3d at 1425. Besides posting "No Trespassing" signs, he picked up his mail in town, and read his utility meters. 8 F.3d at 1428.

Certain portions of Depew's premises were partially obscured from view by a row of coniferous trees. To reach the house and garage, a visitor had to go up a curving, 120-yard long driveway. 8 F.3d at 1425. The garage was fifteen feet from the closest point of Depew's house. 8 F.3d at 1425 n. 1. The house and yard were partially surrounded by a low picket fence. 8 F.3d at 1427.

A law enforcement officer went to Depew's property to investigate a tip that he was growing marijuana. While in front of the door of Depew's garage, the officer smelled the odor of marijuana emanating from the house. The officer obtained a search warrant, and subsequently uncovered a large marijuana grow. 8 F.3d at 1426.

After reviewing the record, the *Depew* panel conceded that the distance between house and garage did not compel a finding of curtilage. 8 F.3d at 1427. However, it attached little significance to the existence of the interior fence surrounding the house and yard. It concluded, instead, that the area in which the garage was situated was "readily identifiable as part and parcel of the house." 8 F.3d at 1427 (internal quotation marks and citation omitted).

Insofar as objective data of wrongdoing was concerned, the panel said that the tip which the officer had received was insufficient. 8 F.3d at 1427. Thus, it would not

credit the officer with knowledge of illegal activity.[10]

Finally, the panel placed great weight on the fact that persons traveling on the highway below had only a limited view of the garage; that the defendant excluded public utility workers from his property; and that he had posted "No Trespassing" signs on his property. When combined with the panel's assessment of factors two and three, this last factor was sufficient tip the panel's scales in a direction different than the scales employed by the district court.

### C. Dunn factors

#### 1. Proximity

■ In *Dunn, Traynor,* and *Brady,* the outbuildings were 180, 75, and 45 feet, respectively, from the residences in question. In *Depew,* the officer was 50–60 feet from the house when he smelled marijuana. Here, the lean-to is 53 feet from the closest point of the residence. Agent Landers was 32 feet south of the lean-to when he conducted the thermal imaging. At that point, he was 105 feet from the house.

#### 2. Enclosure

The house, lean-to, and other outbuildings are in an open area which is largely surrounded by forest. The forest is not particularly dense, however. One can walk between the trees without difficulty.

#### 3. Nature of Use

The "central component" of a curtilage inquiry is "whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *Dunn,* 480 U.S. at 300, 107 S.Ct. at 1139. Thus, it is "especially significant" when law enforcement officers possess "objective data" indicating that the area in question is not "being used for intimate activities of the home." *Dunn,* 480 U.S. at 302, 107 S.Ct. at 1140.

---

**10.** The panel refused to consider the fact that the officer had smelled marijuana while near the defendant's garage. Apparently, the *Depew* panel decided that it could consider the officer's on-site observations only if it first determined that the defendant's garage was not part of the curtilage. The *Depew* panel's approach is difficult—if not impossible—to reconcile with *Dunn, Traynor,* and *Brady. See infra* pp. 1469–1470.

In *Dunn,* the objective data consisted of both surveillance conducted prior to entry upon the property and the officers' on-site observations. 480 U.S. at 302, 107 S.Ct. at 1140. In *Traynor* and *Brady,* the objective data consisted of informant tips and observations the officers made while within the area alleged to be curtilage. *Traynor,* 990 F.2d at 1158; *Brady,* 993 F.2d at 178–79.

Neither *Dunn* nor *Traynor* nor *Brady* says that data regarding usage must be collected by the officer who enters upon the disputed property prior to entry. To the contrary, both the Supreme Court and two Ninth Circuit panels have expressly considered on-site observations when determining the usage to which an area has been put.

With respect to the question of objective data, *Depew* would appear to be remarkably similar to *Traynor* and *Brady.* In *Depew,* law enforcement officers received a tip that Mr. Depew had helped a third person set up a marijuana grow. An officer drove to Depew's residence, which was located in a secluded area. The officer parked his car on a public road which lay below Depew's property. The officer crossed a ditch, scrambled up a steep embankment to Depew's driveway, and began walking toward Depew's garage. As the officer did so, Depew returned from a trip to town. The officer spoke with Depew briefly while the two stood approximately six feet from the garage door. From his vantage point, the officer could smell the odor of marijuana emanating from Depew's house. *Depew,* 8 F.3d at 1425.

In view of *Dunn, Traynor,* and *Brady,* the officer appeared to have two objective pieces of information with respect to usage. One was the tip; the other was the odor the officer smelled while outside Depew's garage. Surprisingly, the *Depew* panel ignored the officer's on-site observations. Instead, it chose to focus exclusively upon the informant's tip, which it concluded was insufficient to constitute objective data. 8 F.3d at 1427.

In this case, Agent Landers had received a tip that the premises at 7703 Scotia Road were being used for illicit purposes. His observations while south of the lean-to confirmed the tip. He heard an exhaust fan similar to those used by marijuana growers. He thought he smelled the odor of marijuana (although he candidly admitted that he could not be sure). His thermal imaging device disclosed the existence of a suspicious heat source. Taken together, these observations constitute objective data that the lean-to was being used in a manner inconsistent with normal family activities.

Excluding Lander's on-site observations would not change matters. The record reflects that the defendant was being investigated by not just one, but two law enforcement agencies during October, 1993. Although Landers did not know it when he went to 7703 Scotia Road early on the twentieth of October, the Spokane County Sheriff's Office had received information that the defendant was distributing marijuana. As a result, the sheriff's office began an investigation which led to the defendant's Pend Oreille County residence. Two weeks prior to Agent Landers' nocturnal surveillance, a sheriff's office investigator made three passes over the area in a helicopter which was equipped with a forward looking infrared device. The investigator concluded that a structure adjacent to the main residence was producing quantities of heat consistent with a marijuana grow.

Even though Landers was unaware of the other investigator's work at the time he conducted his thermal imagining, Landers' ignorance should not preclude the Court from considering the other data. Landers' state of mind is not the focus of this inquiry. The issue is whether the defendant was using the lean-to (and its environs) for activities "associated with the sanctity of a man's home and the privacies of life." *Dunn,* 480 U.S. at 300, 107 S.Ct. at 1139. The Court is entitled to examine all admissible evidence which sheds light on that question.

Thus, even if Lander's on-site observations are excluded, there is objective data that the disputed area was not being used in a manner consistent with the "intimate activities of the home." Two law enforcement agencies had received tips implicating the defendant in the manufacture and distribution of mari-

juana, and aerial surveillance disclosed a suspicious heat source on the premises.

#### 4. Efforts to Obstruct Observation

Here, as in *Depew*, the defendant's residence and outbuildings were largely obscured from the view of persons traveling on the adjacent county road. In addition, efforts had been made to discourage the public from venturing up the driveway. A gate had been installed; fences had been erected on either side of the gate; and at least two "No–Trespassing" signs had been posted. However, the defendant's actions were not entirely consistent with his professed zeal for privacy. In those instances in which law enforcement officers went to the premises, the driveway gate was open—even at night. Moreover, although the defendant claims to have excluded meter readers, his assertion is belied by the record.

#### D. *Conclusion*

It is clear that the thermal imaging challenged by the defendant occurred outside the curtilage. The spot in question lies in a wooded area well away from the house. Indeed, arguing as he does that the tree line forms a natural boundary around the house and outbuildings, the defendant must concede that the thermal imaging took place beyond that point.

Although there is mixed evidence regarding the manner in which the lean-to was used, the record reflects that its primary function was to conceal a large marijuana grow. Law enforcement officers had objective data regarding that illicit use; a use inconsistent with normal domestic activities.

Whatever the defendant's subjective intentions, he did not exclude the public from the premises. The driveway gate was left open. Only one, small "No–Trespassing" sign had been posted. Meter readers were allowed to walk about the premises.

The defendant asserts that Agent Landers violated state trespass laws. Even if Landers was trespassing (and the Court makes

no finding in that regard), he was trespassing upon open fields. Thus, the observations which he made (and included in his affidavit) do not violate the Fourth Amendment.

■ The result would be the same even if the lean-to is a part of the curtilage. An officer standing in an open field is not prohibited from observing activities occurring in a constitutionally protected area. *See, e.g., Dunn*, 480 U.S. at 304–05, 107 S.Ct. at 1141 (officers entitled to look through window into barn).

#### IT IS HEREBY ORDERED:

1. The defendant's request for a *Franks* hearing (Ct.Rec. 20) is **denied.**

2. The defendant's motion to reconsider (Ct.Rec. 29) is **denied.**

3. The defendant's motion to suppress (Ct.Rec. 20) is **denied.**

4. The period from January 11, 1994, until February 9, 1994, is excluded from computation of the defendant's speedy trial deadline. 18 U.S.C. § 3161(h)(1)(F).

**IT IS SO ORDERED.** The Clerk is hereby directed to enter this Order and furnish copies to counsel.

## ON SECOND MOTION TO SUPPRESS

**BEFORE THE COURT** is the defendant's second motion to suppress (Ct.Rec. 28). The defendant is represented by Mr. Phillip J. Wetzel; the government by Assistant United States Attorney Earl A. Hicks. This order is intended to memorialize the Court's prior oral ruling.

#### BACKGROUND

During October, 1993, DEA Special Agent Gary Landers began to investigate allegations that the defendant was growing and selling marijuana.[1] At approximately 1:30 a.m. on the twentieth of October, Agent Landers arrived at the defendant's rural Pend Oreille County residence. Initially, Landers drove up the driveway to the defendant's residence. After taking note of the vehicles which were parked near the house, Landers

---

1. Agent Landers' investigation is described in greater detail in the Order Denying Motions (Ct. Rec. 35).

returned to the public road. He parked his vehicle, and set out on foot through a wooded area.

Landers was equipped with night-vision goggles and a thermal imaging device. The latter is an instrument which detects differences in temperature on the surface of an object. As he hiked through the woods beyond the curtilage of the defendant's residence, Landers stopped at several points to scan various structures. One was a 20–by–20 lean-to.

While standing 32 feet south of the lean-to, Landers observed a small storage shed under the north end of the lean-to. Bales of hay had been stacked behind the shed. The bales were arranged in a manner which left air spaces between them.

From his vantage point, Landers could hear the sound of an exhaust fan coming from the direction of the bales. In Landers' experience, such fans are commonly associated with indoor marijuana grow operations. Landers thought he smelled the odor of marijuana, but couldn't be sure because of the hay. Landers scanned the bales of hay with a thermal imaging device. It appeared to him that the hay was emitting an unusually large quantity of heat.

Shortly thereafter, Landers left the premises. Seven days later, he applied for a search warrant. Probable cause was predicated—in part—upon the heat emissions disclosed by the thermal imaging device. Landers' request for a search warrant was approved by a magistrate judge. During the ensuing search, officers discovered a large marijuana grow beneath the shed Landers had observed.

The defendant now challenges Landers' use of the thermal imaging device. Citing *State v. Young*, 123 Wash.2d 173, 188–94, 867 P.2d 593 (1994), he argues that the thermal scan which Landers conducted is a warrantless search proscribed by the Fourth Amendment.

### RULING

Neither the Ninth Circuit nor any other federal appellate court has determined whether thermal imaging constitutes a search. Indeed, the Ninth Circuit has specifically refused to decide that question. *United States v. Feeney*, 984 F.2d 1053, 1056 (9th Cir.1993). However, a growing number of district courts have ruled that thermal imaging is *not* a search for purposes of the Fourth Amendment. *See, e.g., United States v. Porco*, 842 F.Supp. 1393, 1397–1398 (D.Wyo.1994); *United States v. Deaner*, No. 1:CR–92–0090–01, 1992 WL 209966, at *4, 1992 U.S. Dist. LEXIS 13046, at *11 (M.D.Pa. July 27, 1992); *United States v. Penny–Feeney*, 773 F.Supp. 220, 228 (D.Haw.1991), *aff'd on other grounds*, 984 F.2d 1053 (9th Cir.1993). For the reasons set forth below, this Court concludes that its sister courts are correct.

■ The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Under the Fourth Amendment, a search occurs when the government has infringed upon an actual expectation of privacy, and the expectation of privacy is one which society is prepared to recognize as reasonable. *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986) (citing *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)); *United States v. Lingenfelter*, 997 F.2d 632, 637 (9th Cir.1993).

■ A thermal imaging device does not "detect or enhance visible light, but rather, operates in the thermal infrared spectrum to detect differences in temperature [on] the surface of objects being viewed. It is a passive, non-intrusive system which does not penetrate or send any rays or beams into [the object being scanned]." *Porco*, 842 F.Supp. at 1395. In effect, a thermal imaging device discloses "emanations of heat or relative absences thereof." *Penny–Feeney*, 773 F.Supp. at 225.

Here, thermal imaging revealed differences in temperature on the surfaces of hay bales. We now know that the surfaces which Agent Landers scanned appeared comparatively warm because heat from the defendant's underground marijuana grow was passing through them. The question, then,

is whether the defendant's conduct reflected an expectation that the heat escaping from his marijuana grow would remain private. *See Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

The defendant installed an exhaust fan which vented warm air from his grow. By doing so, he knowingly exposed exhaust vapors and heat to public observation. Consequently, he cannot claim an actual expectation of privacy in the heat which was emanating from his underground marijuana grow. *Penny–Feeney,* 773 F.Supp. at 226 (no subjective expectation of privacy in heat vented from marijuana grow by means of exhaust fans). *See generally Air Pollution Variance Board v. Western Alfalfa Corp.,* 416 U.S. 861, 865, 94 S.Ct. 2114, 2115–16, 40 L.Ed.2d 607 (1974) (air pollution inspector committed no cognizable invasion of plant owner's privacy when he went on the premises of the plant to test smoke which was rising from the plant's chimneys since the plumes of smoke were visible to all who were near the plant).

Even if the defendant had manifested a subjective expectation that the escaping heat would remain private, he would still have to demonstrate that his expectation is "one that society is prepared to recognize as reasonable." *Smith,* 442 U.S. at 740, 99 S.Ct. at 2580 (citing Justice Harlan's concurring opinion in *Katz* ) (internal punctuation omitted). That he cannot do.

It is well established that electronic surveillance may defeat a reasonable expectation of privacy. *Katz v. United States,* 389 U.S. 347, 362, 88 S.Ct. 507, 517, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). Determining whether an expectation is reasonable is often difficult, however, since no one factor is dispositive. *Oliver v. United States,* 466 U.S. 170, 177, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984).

Some consideration must be given to the "place" which is subject to surveillance. *Katz,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). For example, a person may legitimately expect that his residence will remain free from governmental intrusion absent a warrant. *See United States v. Karo,* 468 U.S. 705, 714, 104 S.Ct. 3296, 3303, 82 L.Ed.2d 530 (1984).

Although the question of "place" cannot be ignored, the fact remains that "the Fourth Amendment protects people, not places." *Katz,* 389 U.S. at 351, 88 S.Ct. at 511. A person can relinquish Fourth Amendment protections by knowingly exposing otherwise private information to the public. *Katz,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). That leads to a second important consideration. Has the allegedly private information been disclosed to others?

*Smith v. Maryland* is illustrative. In that case, the Supreme Court held that the use of a pen register to trace calls from one telephone to another did not violate a reasonable expectation of privacy. "When [the defendant] used his phone, [he] voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business." *Smith,* 442 U.S. at 744, 99 S.Ct. at 2582.

Finally, the Court must consider whether the surveillance which occurred here was unduly invasive. Because electronic surveillance may rely upon sophisticated technology which is not generally available to the public, *see Dow Chemical Co. v. United States,* 476 U.S. 227, 238, 106 S.Ct. 1819, 1827, 90 L.Ed.2d 226 (1986), thereby enabling the government to monitor activities or objects otherwise withdrawn from public view, *see Karo,* 468 U.S. at 716, 104 S.Ct. at 3304, careful consideration must be given to the nature of the information which is actually disclosed. *See Dow Chemical Co.,* 476 U.S. at 238, 106 S.Ct. at 1827 (significant that photographs taken by the government did not disclose "intimate details").

Turning first to the question of "place," *United States v. Karo* provides an important benchmark. In that case, the Supreme Court held that the government's decision to monitor electronic signals which were being transmitted from the *interior* of a residence by means of a beeper which a suspect had unwittingly carried into the house infringed upon a legitimate expectation of privacy. *Karo,* 468 U.S. at 715, 104 S.Ct. at 3303. Here, by contrast, Agent Landers used a

thermal imaging device to scan the *exterior* of a stack of hay bales. The bales were over fifty feet from the defendant's dwelling, and outside the curtilage.

Next, the Court must consider whether heat which escapes from a structure has been knowingly "exposed" to public observation. In that regard, it is surely relevant that heat is known to dissipate. (Indeed, knowing that fact, homeowners install insulation in order to keep heating bills down.) Moreover, as heat escapes, it raises the temperature of surfaces through which it passes. During cold weather, the consequences of heat emissions are readily visible. For example, the roof of a poorly insulated house may be free of snow, whereas snow remains on the roof of a better insulated house just down the street.

The fact that heat is known to dissipate has led several district courts to characterize escaping heat as "heat waste" or "abandoned heat." *See, e.g., Penny–Feeney*, 773 F.Supp. at 225. Based upon that characterization, courts have analogized heat waste to garbage which is bagged and set on the curb for pickup. Just as an individual lacks a reasonable expectation of privacy in a sealed garbage bag sitting beside the street, *see California v. Greenwood*, 486 U.S. 35, 40, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30 (1988), so, too, he lacks a reasonable expectation of privacy in heat emissions. *See, e.g., Penny–Feeney*, 773 F.Supp. at 226.

Citing *State v. Young*, the defendant denies that escaping heat can be characterized as publicly-exposed "waste." According to him, the decision to bag one's garbage and set it on the curb constitutes a deliberate act. Heat, on the other hand, escapes automatically.

The defendant's argument ignores the fact that he set up a sophisticated, underground marijuana grow. Because the plants were being grown in a basement-like space under a storage shed, the defendant had to provide artificial light. The lighting system he employed (and the hundreds of growing plants)

generated both heat and water vapor. Some heat was vented; some heat escaped through the walls. Either way, the defendant generated the heat knowing that it would dissipate. The fact that heat emissions were "automatic" once the grow was in operation does not make them any less knowing.

The defendant has another reason for insisting that the analogy to *California v. Greenwood, supra*, is inapt. While it may be foreseeable that the neighbor's dog will tear open one's garbage bag thereby exposing its contents, the owner of a building does not expect law enforcement officers to scan his structure for thermal emissions.

With respect to the typical owner's expectations, the defendant is probably correct. To the extent that he is, he may have identified a subjective expectation of privacy in heat emissions—at least in those situations in which the building owner is not actively venting warm air. However, as far as the second prong of the *Katz* inquiry is concerned, the issue is not whether the defendant had a subject expectation of privacy, but whether any expectation he may have had is objectively reasonable.

That leaves a third (and final) consideration. Just how invasive was the thermal scan conducted by Agent Landers? "Very," according to the defendant. Again relying on *State v. Young*, he insists that thermal imaging is significantly more invasive than rummaging through a garbage bag.

When determining whether surveillance is unduly invasive, a court must focus on what actually occurred, not on what might occur in some future case. As the Supreme Court has explained, "Fourth Amendment cases must be decided on the facts of each case, not by extravagant generalizations. '[W]e have never held that potential, as opposed to actual, invasions of privacy constitute searches for purposes of the Fourth Amendment.'" *Dow Chemical Co.*, 476 U.S. at 238 n. 5, 106 S.Ct. at 1827 n. 5 (quoting *Karo*, 468 U.S. at 712, 104 S.Ct. at 3302).[2]

**2.** In *State v. Young*, 123 Wash.2d 173, 867 P.2d 593 (1994), law enforcement officers scanned only the exterior of the residence. The scan revealed three things: the foundation was warm in certain spots; the lower portion of the chim-

ney was warm, but the upper portion was cool; one of two chimney vents was warm, while the other was cool. 123 Wash.2d at 177–78, 867 P.2d at 595. Contrary to both *Karo* and *Dow Chemical Co.*, the Washington Supreme Court's

It is true that the thermal imaging device which Agent Landers used disclosed heat emissions from all sources, not just those generated by the defendant's illicit activities. *Cf. Lingenfelter,* 997 F.2d at 638 (canine sniff does not intrude on legitimate expectation of privacy because it reveals nothing about non-contraband items). Against that, however, must be balanced the non-intrusive nature of thermal imaging. The device Landers used did not create an "image" of the interior of the haystack. Far from it. Looking through the instrument, Landers could see only the exterior of the bales. Warmer surfaces appeared whiter; colder surfaces appeared darker.

It is also true that thermal imaging enhances the senses. Heat emissions which might not be visible to the human eye are readily discerned through thermal imagining. That does not make the technique impermissibly invasive, however. *See, e.g., Dow Chemical Co.,* 476 U.S. at 238, 106 S.Ct. at 1827 (aerial photographs provided "more detailed information than naked-eye views"); *United States v. Knotts,* 460 U.S. 276, 285, 103 S.Ct. 1081, 1087, 75 L.Ed.2d 55 (1983) (electronic beeper used to track suspect's movements); *Smith,* 442 U.S. at 744, 99 S.Ct. at 2582 (pen register used to trace telephone calls). When determining whether a surveillance technique is invasive, the focus must be on the character of the information actually revealed.

In that regard, the record reflects that the information disclosed to Agent Landers concerning the baled hay was neither sensitive nor personal. *See Dow Chemical Co.,* 476 U.S. at 238, 106 S.Ct. at 1827 (aerial photographs "not so revealing of intimate details as to raise constitutional concerns"). Thus, this situation is a far cry from *Katz,* where a

listening device was used to monitor incriminating communications. 389 U.S. at 348, 88 S.Ct. at 509.

Based upon the three foregoing considerations, the Court concludes that the thermal imaging which Agent Landers conducted did not infringe upon a legitimate expectation of privacy. It is one thing to insert an electronic device into an unsuspecting person's residence in order to collect incriminating evidence, *see Karo,* 468 U.S. at 715, 104 S.Ct. at 3303, it is quite another to use an electronic device to scan the exterior of a structure in order to uncover evidence the person has knowingly exposed. Contrary to the defendant's assertion, the fact that information gleaned from surveillance of external phenomena allows law enforcement officers to draw accurate inferences regarding activities occurring inside a structure does not convert the surveillance into a search. *See generally United States v. Johns,* 469 U.S. 478, 486, 105 S.Ct. 881, 886, 83 L.Ed.2d 890 (1985) (certain containers may not support reasonable expectation of privacy because contents may be inferred from their outward appearance).

In sum, the defendant has failed to demonstrate either that the thermal imaging which Agent Landers conducted infringed on an actual expectation of privacy, or, that if such an expectation existed, it is one which society is prepared to recognize as reasonable. *See Katz,* 389 U.S. at 360, 88 S.Ct. at 516 (Harlan, J., concurring).[3] It follows that the thermal imaging which occurred in this case did not constitute a search within the meaning of the Fourth Amendment. The defendant's motion to suppress will therefore be denied.

**IT IS HEREBY ORDERED:**

Fourth Amendment analysis did not concentrate on the thermal imaging which actually occurred. Instead, the Court's ruling was based (in no small part) upon generalizations regarding potential invasions of privacy. *See, e.g., Young,* 123 Wash.2d at 193, 867 P.2d at 603 ("one could not stand near an open window or any part of the home constructed of material such as plywood because the device is capable of revealing the presence of human forms in these circumstances").

3. Much of the heat generated by an indoor marijuana grow comes from the artificial lighting system, a mechanism which often consumes large quantities of electricity. Since a law enforcement officer may obtain power consumption records without a warrant, *see Smith,* 442 U.S. at 743–44, 99 S.Ct. at 2582 (no expectation of privacy in information disclosed to third persons), requiring the officer to secure a warrant before scanning the exterior of a structure for signs of the heat generated by the lighting system would do little to further the privacy interests protected by the Fourth Amendment.

1. The defendant's second motion to suppress (Ct.Rec. 28) is **denied.**

2. The period from February 11, 1994, until February 22, 1994, is hereby excluded from the computation of the defendant's speedy trial deadline. 18 .U.S.C. § 3161(h)(1)(F).

**IT IS SO ORDERED.** The Clerk is hereby directed to enter this Order and furnish copies to counsel.